**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Vito GIACALONE, Defendant-Appellant.**

No. 78-5055.

United States Court of Appeals,
Sixth Circuit.

Argued June 19, 1978.

Decided Dec. 18, 1978.

Rehearing Denied Jan. 22, 1979.

N. C. Deday LaRene, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., C. Stanley Hunterton, Sp. Atty., Detroit Strike Force, U. S. Dept. of Justice, Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and CELEBREZZE and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Vito Giacalone was found guilty in a jury trial of unlawful possession and receipt of a firearm by one having been convicted of a felony, in violation of 18 U.S.C. § 1202(a)(1) (Appendix) (1976). On direct appeal he challenges the procedures which produced the weapon in question, complains that the trial judge committed reversible error in

refusing to excuse three jurors for cause, and finally complains that the trial judge unfairly supplemented the charge to the jury, thereby coercing it into convicting him. We affirm.

## I.

### THE SEARCH AND SEIZURE

The incident which resulted in Giacalone's indictment and ultimate conviction here arose when Giacalone was arrested upon a federal warrant charging him with operation of an illegal numbers business and a related conspiracy charge. Giacalone was arrested by federal authorities at 4:41 p. m., March 29, 1977, as he was entering, or about to enter,[1] his Cadillac automobile which was then parked in the parking lot of the Southfield Athletic Club, a private club near Detroit. At the time of the arrest, the FBI agents seized but did not search Giacalone's automobile. There was outstanding an application by the government for a seizure warrant under 18 U.S.C. § 1955(d) upon the theory that the automobile was subject to forfeiture because of its alleged use in the gambling operation. The search warrant had not been issued at the time of Giacalone's arrest and the seizure of the car, and apparently it was ultimately later denied by a magistrate. A few minutes after Giacalone was arrested, Special Agent Donald C. Bretnell, while inside the Southfield Athletic Club, spotted Dominic Vivio, recognized by him as Mr. Giacalone's driver, engaged in a telephone conversation. At that time he overheard Vivio state his concern that if the police searched the car, "they [might] find the goddamn thing in there." A confidential informant, "FBI-2",

likewise overheard Vivio tell the defendant Giacalone, "[w]e've got to get that gun out of there right now." The preceding January the FBI had been informed by another confidential informant, "FBI-1", that he "had overheard a conversation between Vito Giacalone and an unidentified white male during December 1976 where Giacalone stated he, Giacalone, had recently installed a secret compartment in his Cadillac." FBI-1 added corroborating details concerning the car's description and license number. A conversation involving Giacalone which FBI-2 had overheard in February, 1977 also squared with what FBI-1 had stated concerning the December, 1976 conversation.[2] On the basis of the foregoing information and further noting Giacalone's status as a convicted felon, the FBI prepared an affidavit for presentation to the district court in its application for a search warrant.[3] Meanwhile the automobile was taken into possession and transported from the Southfield Athletic Club to the FBI garage where it was secured until the warrant was issued. The search took place the following day, March 30, pursuant to the warrant. In a secret compartment installed beneath the dashboard of the Cadillac the FBI discovered a Smith and Wesson pistol.

While appellant urges that the affidavit for the search warrant was insufficient, an assertion which we find without merit, his primary complaint is that the information which was incorporated in the affidavit and provided the probable cause was itself illegally obtained because it was the product of the warrantless seizure and detention of Giacalone's automobile which had occurred at the time of his arrest on March 29.

---

1. The evidence varies somewhat, and the district court did not make an express finding concerning Giacalone's precise location at the time of the arrest. In view of our decision to uphold the seizure on other grounds, we need not address whether the detention and search of the automobile may be sanctioned as incident to Giacalone's arrest. *See generally United States v. Lewis,* 504 F.2d 92, 103–04 (6th Cir. 1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975).

2. The affidavit presented to the court in the search warrant application recited a sufficient basis for the reliability of FBI-1 and FBI-2, noting and describing previous occasions on which they had provided accurate information to law enforcement officials.

3. Apparently, the government had elected to first seek a warrant based upon the forfeiture statute, 18 U.S.C. § 1955(d), rather than the felon-in-possession charge in order to avoid revelation of its informants, notably FBI-1.

■ The temporary detention of Giacalone's car at the time of his arrest, while awaiting the issuance of a search warrant, was certainly not unreasonable, even though the forfeiture warrant which was originally sought was not issued. Coupled with the information contained in the search warrant affidavit, the government's evidence at the suppression hearing sufficed to establish that at the time the automobile was first detained in the parking lot of the Southfield Athletic Club the government had probable cause to believe it contained the hidden firearm.[4] In the meantime, of course, the agents became possessed of further hard evidence which would and did, indeed, support the issuance of a search warrant. Their detention meanwhile of the automobile, whether in the parking lot or, as here, at a police compound following its removal, represented a reasonable and minimal intrusion justified by the exigent circumstances.[5]

Nor can we accept appellant's argument that the warrantless detention of the Cadillac, although supported by probable cause and exigency, was nonetheless unreasonable because it represented an effort to avoid prior review by a magistrate and thus frustrate the warrant requirement. *See generally United States v. Chuke*, 554 F.2d 260, 263–64 (6th Cir. 1977). In our judgment, the government's conduct represents scrupulous adherence to the standards of reasonableness which the Supreme Court has determined are mandated under the Fourth Amendment in conjunction with the seizure and search of automobiles.

The facts of this case fully suggest the propriety of the exception to the warrant requirement in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), in which the Court distinguishes searches of stable structures such as dwelling houses from the "search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 U.S. at 153, 45 S.Ct. at 285. The automobile exception in *Carroll* has been repeatedly reaffirmed by the Supreme Court and in *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 53 L.Ed. 538 (1977), the Supreme Court further noted that the vehicle's mobility is not the sole touchstone, since warrantless searches have been upheld "in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." *Cady v. Dombrowski*, 413 U.S. 433, 441–42, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). A further justification for this exception to the warrant requirement lies in the diminished expectation of privacy pertaining to an automobile. *Chadwick, supra*, 433 U.S. at 12–13, 97 S.Ct. 2476.

Finally, appellant's assertion that somehow the alleged unlawful physical seizure of the automobile unlawfully produced the evidence which was incorporated in the application for a search warrant is without

---

4. Testifying at the suppression hearing, Special Agent Bretnell indicated that he had read an informant report which FBI–1 had submitted to the Bureau prior to March 29, 1977. The report revealed that Giacalone himself told FBI–1 that there was a gun in his car. This information was not, however, incorporated in the search warrant affidavit and we have not considered it in our review of the warrant, although it has been considered in judging the warrantless detention of the Cadillac on March 29.

5. *Cf. Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (An automobile seized in a parking lot was taken to a station house and searched). "For constitutional purposes, we see no difference between

on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 399 U.S. at 52, 90 S.Ct. at 1981. In view of our conclusion that the FBI had probable cause at the time it detained Giacalone's car, we need not address the government's claim that the mere detention of an automobile pending the issuance of a warrant is subject to less demanding strictures than a seizure and search. *See generally Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 262 (1970).

merit. The officer's seizure of the automobile, wrongful or not, produced none of the information concerning the presence of a gun in the car upon which the valid search warrant was later issued. The gun cannot, therefore, be said to be the fruit of any alleged illegality in detaining the car. Good police work, not an unlawful seizure, produced the evidence which led to the search warrant and ultimately to the seizure of the pistol.

## II.

### THE JURY VOIR DIRE

■ The trial court conducted a separate *voir dire* of the venire to determine the possibility of disqualification due to prejudice, with each of the prospective jurors being examined individually and out of the hearing of the other jurors. Defense counsel was permitted to question the jurors directly after the court had concluded its questioning. Giacalone asserts that the trial court erred in failing to grant his motion to strike for cause three prospective jurors, Glantz, Noffert and Gray. When the challenge for cause was denied, Giacalone exercised his peremptory challenges to excuse the jurors so that none served on the jury which ultimately ruled on his guilt. At the same time Giacalone asserts that the court's refusal to strike the jurors for cause prejudiced him by forcing him to exercise his peremptory challenges, diminishing the number of such challenges which he was otherwise entitled under the law to employ.

In each case the cause asserted was the acknowledgement by the juror that he had heard of Giacalone or his surname prior to the trial, and had associated it in one way or the other with illegal or improper activities. Thus, Glantz thought that he had heard the name Giacalone as far back as ten

or twelve years previously, possibly as the name of a former owner of a store in which he had worked, and that the name generally in his mind had "something to do with crime, I guess." Juror Noffert had raised his hand when the court asked whether any jurors had heard the name of Vito Giacalone before. Mr. Noffert informed the court and defense counsel that he had worked for a finance company eight or nine years previously and that one of the men receiving the payments on one of the loans, he believed, was Giacalone. Noffert also indicated that he had read Giacalone's name in the papers and in articles concerning organized crime. Under questioning by counsel for the defendant, Noffert had indicated that at the time he had considered the loan activity abnormal, but in answer to whether he thought there was "something shady or something funny about those loans", Noffert indicated that he had no idea since the transaction had taken place prior to his employment by the company and that he had merely serviced the loan some years ago. Juror Gray indicated that she had heard the name on the news and on radio and that she had "a bad connotation, a bad feeling, about the name. But, I couldn't say a specific case . . . . Well, I think of the name involved with crime, or organized crime, and I guess, for that reason, it leaves a bad feeling with me." [6]

Further questioning by the court, however, made it clear that each juror was willing to put aside any prior opinion or knowledge he or she might have concerning the defendant and to judge the question of his guilt or innocence solely on the basis of the facts adduced at trial. No juror indicated any knowledge of the incident involved in the trial. While we believe it would probably have been wiser to have

---

6. It is possible that some adverse association might have stemmed from an identification of the name Giacalone with Vito's brother Anthony, whose conviction has recently been affirmed by this court in *United States v. Giacalone*, 574 F.2d 328 (6th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978); *see also United States v. Giacalone*, 541 F.2d 508 (6th Cir. 1976) (en banc) (motion for return

of a blood-stained automobile belonging to Vito's nephew, Joseph Giacalone, and seized in connection with an FBI investigation into the disappearance of former Teamsters' president James Hoffa). No motion for change of venue on that account was made, nor was any knowledge of the legal difficulties of defendant's relatives evident upon the record here.

excused the jurors for cause, we cannot say that the failure to do so was an abuse of the discretion entrusted to the court in such matters, and it is clear to us that the amount of knowledge possessed by the jurors was not sufficient to have demanded invariably that they be excused for cause. No predisposition to convict is evident in the answers and in fact the very candor of the jurors, taken with skillful handling by the trial court, may well have produced in them a greater receptivity to accord Giacalone a fair trial than might have resulted had they had no information at all or not been questioned.

The facts here are not unlike those in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), wherein the Supreme Court upheld the petitioner's conviction by a jury composed in part of persons who had some acquaintance with the robbery for which Murphy had been indicted and of others who had indicated their knowledge of Murphy's past crimes. Analyzing the publicity evident in the record, the Supreme Court stated:

The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. [717,] at 722, [81 S.Ct. 1639, at 1642, 6 L.Ed.2d 751] [(1961)]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.,* at 723 [81 S.Ct. 1639, at 1642].

At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Ibid.*

421 U.S. at 799–800, 95 S.Ct. at 2036. The degree of potential prejudice evident in the record here is considerably less than that shown in *Murphy.* In *Murphy,* as here, "[t]he *voir dire* . . . indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Id.* at 800, 95 S.Ct. at 2036.

And in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the Supreme Court observed:

Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the *voir dire* examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy,* extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy v. Florida, supra,* at 798 (95 S.Ct. 2031).

432 U.S. at 303, 97 S.Ct. at 2303. It is true that *Irvin, Murphy* and *Dobbert* applied a constitutional standard to state prosecutions and that we are involved here with the proper application of federal rules and of our broader supervisory powers over the trial of a defendant in a federal criminal prosecution. *Cf. Murphy v. Florida, supra,* 421 U.S. at 803–04, 95 S.Ct. 2031 (Burger, C. J., concurring in the judgment). Nevertheless, the standards of *Murphy v. Florida* and *Irvin v. Dowd* have been followed by our court in federal prosecutions. Relying upon

*Murphy* and *Irvin,* we held in *United States v. Gay,* 522 F.2d 429 (6th Cir. 1975):

> If a juror can lay aside any preconceptions about the case and try it solely on the evidence presented in court, it is not error to fail to dismiss such a juror for cause.

*Id.* at 432. *See also United States ex rel. Stickler v. Tehan,* 365 F.2d 199 (6th Cir. 1966), *cert. denied,* 386 U.S. 992, 87 S.Ct. 1306, 18 L.Ed.2d 336 (1967), and *United States v. Mitchell,* 556 F.2d 371 (6th Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 406, 54 L.Ed.2d 284 (1977).

■ There having been no abuse of discretion in failing to strike the jurors for cause and there being no challenge to the jurors who actually served, there is even less merit to the suggestion that in some indistinct way, Giacalone's exhaustion of his peremptory challenges and his inability to exercise more in some way entitles him to a new trial. The trial court enjoys a superior perspective as to which alleged prejudices are real and which are imagined, and its judgment must ordinarily be respected.

In some instances all jurors, or all intelligent jurors at least, will have had some exposure through the news media either to the defendant's reputation or to the offense with which he is charged. *See, e. g., United States v. Haldeman,* 181 U.S.App.D.C. 254, 559 F.2d 31, 59–71 (1976) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Johnson,* 584 F.2d 148 (6th Cir. 1978). There must necessarily be a broad margin for discretion in the trial court to determine challenges for cause. *Mitchell, supra,* 556 F.2d at 379. It is for precisely this reason that peremptory challenges are provided, not as a matter of constitutional requirement, but rather as an additional safeguard even where the danger of prejudice is not of constitutional proportions. That Giacalone was able to take advantage of the cushion provided by the exercise of peremptory challenges reflects not a denial of justice but the achievement of it under good rules designed for the purpose.

## III.

### JURY INSTRUCTIONS

■ Giacalone's final allegation of error concerns the actions of the trial court after the jury had retired to deliberate upon a verdict. After two and one-half days of deliberations, the jury delivered a note to the court which stated:

> After careful review of all of the evidence presented to us, we cannot come to a unanimous decision. We request your guidance in the subsequent procedure.

The inquiry came at a time when neither the defense counsel nor the defendant was available and the court, five to ten minutes after the inquiry was received, delivered a note to the jury which read:

> Please continue your deliberations.

#### Judge Joiner

Giacalone claims that this *ex parte* conduct on the part of the district judge violated the requirement of Rule 43, Fed.R. Crim.P., that "[t]he defendant shall be present . . . at every stage of the trial" and that it was in violation of *Shields v. United States,* 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed.2d 787 (1927), and more recently, of *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975). *See also United States v. United States Gypsum Co.,* —— U.S. ——, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Unlike the facts in those cases, however, the jury did not solicit and the court did not give any *ex parte* instructions about the merits of the case or the manner of the jury's deliberations. Although it may have been technically in error for the trial judge to have made even this limited response to the jury, the error was not under the circumstances prejudicial. As we held in *United States v. Reynolds,* 489 F.2d 4 (6th Cir. 1973), *cert. denied,* 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974), the rule requiring that a defendant be present at all stages of the trial must be considered with Rule 52(a), Fed.R.Crim.P., providing that harmless error is to be disregarded, citing *United States v. Gradsky,* 434 F.2d 880 (5th Cir. 1970), *cert. denied,* 401 U.S. 925, 91

S.Ct. 884, 27 L.Ed.2d 828 (1971), 409 U.S. 894 (1972); and *Yates v. United States,* 418 F.2d 1228 (6th Cir. 1969). Thus we held that a forbidden communication will not always be reversible and that the standard is whether there is "any reasonable possibility of prejudice." 489 F.2d at 8, *quoting Wade v. United States,* 142 U.S.App.D.C. 356, 441 F.2d 1046, 1050 (1971). We cannot agree with appellant that the note to the jury was "tersely worded" or "coercive" and indeed, appellant concedes that taken alone, any error would not be reversible. He urges us, however, to consider it in the context of other events which later occurred in the course of the jury's deliberations.

■ Potentially more serious than the court's *ex parte* communication is Giacalone's assertion that the trial court exceeded its permissible bounds when it delivered supplemental instructions in response to the jury's request for further assistance on the definition of the term "knowingly." The request for instructions came after the court, on its own initiative, had inquired of the jury whether there were any questions which it might have about law, a questionable procedure, in our judgment, since the jury had not up to that point indicated that it had such questions. Upon receipt of the inquiry, the trial judge drafted instructions which he made available to counsel for comment and to which Giacalone objected.[7]

Appellant's counsel objects not so much to the instructions given as to the fact that they appeared to exceed the scope of the request made by the jury, and that they deviated from the definition of "knowingly" as earlier given by the trial judge, thus depriving the defense counsel of an opportunity to argue the new language in his closing remarks to the jury.

Particularly useful is the following language of the Fifth Circuit in *United States v. Carter,* 491 F.2d 625, 633 (5th Cir. 1974):

When after an hour and 40 minutes of deliberation a jury returns, not with a verdict, but with a request for clarification of a particular point of law, it must be recognized that the jury has been un-

---

7. THE COURT: You have asked for a further definition of the word, knowingly, as used in the instruction. I am giving you this instruction to try to be of assistance to you pursuant to your request.

The law of this case requires that before you can find the Defendant guilty of the crime charged, you must find, beyond a reasonable doubt, that the Defendant, knowingly, received, or possessed a firearm.

Knowingly, as used in this instance, is required to be shown to insure that no one will be convicted because of mistake, or accident, or other innocent reason. It is a requirement that the Defendant had knowledge of his receiving, or possessing the firearm. This does not include intent to violate the law, that is not required, nor does it require knowledge that there was such a law, or knowledge that the firearm traveled in interstate commerce. The knowledge that is required is that of receiving or possessing the firearm.

How do you determine whether or not such knowledge exists?

Proof of Defendant's knowledge of possession of a firearm, which you must remember must be proved beyond a reasonable doubt, does not require direct testimony that the Defendant held it in his hand, or used it, to show knowledge of possession. Knowledge of possession can be proved in other ways, and from circumstantial evidence.

You look at all the evidence, direct and circumstantial. You determine whether there is evidence that directly bears on this question, and you determine whether there is evidence of other circumstances that, indirectly, bears on this question. In doing all of this, you are to consider only the evidence in the case, but, in your consideration of the evidence, you are not limited by the bold [sic] statements of the witnesses. You are not limited to what you have seen, or heard, in the courtroom. You are permitted to draw from the facts produced, such reasonable inferences as you feel are justified in light of experience.

Knowledge ordinarily may not be proved, directly, because there is no way of fathoming or scrutinizing the human mind. But, you may infer the Defendant's knowledge from the surrounding circumstances. You may consider all facts and circumstances in evidence which bear on the issue of knowledge.

Unless you find knowledge of possession as outlined herein, beyond a reasonable doubt, you should acquit the Defendant. If you find that knowledge has been so proved, you should consider the other instructions of the case.

able to reach a decision on the basis of all it has heard up until that time. Under those circumstances a trial judge must be acutely sensitive to the probability that the jurors will listen to his additional instructions with particular interest and will rely more heavily on such instructions than on any single portion of the original charge. Thus, the court must exercise special care to see that inaccuracy or imbalance in supplemental instructions do not poison an otherwise healthy trial.

Subjecting the judge's instructions to close scrutiny because of the highly sensitive nature of his role at that state of the trial, we conclude that the trial judge's comments met the high standard of balance and fairness necessary to assure defendant a fair trial. Defendant's counsel objected to giving any instruction at all. He did not indicate any specific dissatisfaction with the language employed nor request that the court add to or amend the instruction proposed and given, although he now claims that the instructions should have reflected certain cautions to the jury on the use of circumstantial evidence.

We cannot agree with appellant's assertion that the supplemental instructions given violated Rule 30, Fed.R.Crim.P.,[8] because they went beyond the instructions originally submitted to the jury. Giacalone argues that Rule 30 permits counsel to effectively plan closing presentations to the jury, *United States v. Bass,* 425 F.2d 161, 163 (7th Cir. 1970), and therefore effectively precludes a court from giving any instruction which has not already been given in its original charge and the substance of which has not been known to defense counsel prior to closing arguments.

Our court has recognized the duty of the trial court to clear up uncertainties which the jury brings to the court's attention. *United States v. Rowan,* 518 F.2d 685, 693 (6th Cir.), *cert. denied,* 423 U.S. 949, 96 S.Ct. 368, 46 L.Ed.2d 284 (1975). We do not believe that Rule 30 precludes any supplemental instructions except those which simply recite what was previously given; were that so, the instructions would be merely repetitive and not supplemental. We prefer a rule which measures the propriety of a supplemental instruction not by whether it is a verbatim repetition but instead by whether it fairly responds to the jury's inquiry without creating a prejudice which Rule 30 was designed to avoid. In other words, the decision is committed to the sound discretion of the trial judge and our review is limited to determining whether that discretion was abused, taking into account the sensitive nature of the judge's responsibility at this stage of the trial and the duty of the trial judge to provide impartial and effective guidance on the law for the jury to follow in its deliberations. Under such circumstances we do not believe that the trial court's discretion was abused.

 Finally, appellant complains of the fact that the supplemental instructions given by the court were followed closely by a so-called *Allen* charge. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). While it is true that we have held that "[a]ny variation upon the precise language approved in *Allen* imperils the validity of the trial," *United States v. Scott,* 547 F.2d 334, 337 (6th Cir. 1977),[9] we observe that the trial judge's statement roughly follows the instruction contained in 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, § 18.14 (3d ed. 1977), an instruction implicitly approved by the Supreme Court in *Kawakita v. United States,* 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed.

---

**8.** Rule 30 provides in part:

> The court shall inform counsel of its proposed action upon the requests [for instructions] prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed.

**9.** In fact, the *Allen* opinion did not quote the instructions which it was approving, although it noted that the instructions had been taken literally from *Commonwealth v. Tuey,* 62 Mass. (8 Cush.) 1 (1851). *See* 164 U.S. at 501–02, 17 S.Ct. 154; *Pugliano v. United States,* 348 F.2d 902, 903–04 (1st Cir.), *cert. denied,* 382 U.S. 939, 86 S.Ct. 390, 15 L.Ed.2d 349 (1965).

1249 (1952).[10] We further note that while defense counsel generally resisted the delivery of an *Allen* charge, no specific objection was made to the language employed except in one particular and that in this regard the trial court, in the charge actually given, acceded to the language proposed by defense counsel.[11]

For the first time on appeal, however, defense counsel complains that the charge given unduly emphasized any expense involved to the parties in trying the lawsuit.[12] It is true that in *United States v. Harris,* 391 F.2d 348, 354 (6th Cir.), *cert. denied,* 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145 (1968), our court found "questionable" the undue emphasis which the trial court placed upon the expense and burden of conducting a trial. At the same time, while *Harris* noted disapproval of the language, it did not determine whether such language constituted reversible error and we hold it is not so here, at least in the absence of any specific objection thereto at the time. Under the circumstances we do not believe that the *Allen* charge as given unduly emphasized expense of the trial, nor was it coercive.

Giacalone also objects to that portion of the charge in which the trial judge indicated that the parties "have presented their case as well as they can" and that "[i]t does not appear that another trial could be more exhaustively, or more completely tried as has been this trial." [13] Again, the language objected to was substantially that which is approved of in Devitt & Blackmar and derived from *Kawakita, supra.* This objection was not made to the district court and we decline to address the claim for the first time on appeal. It certainly was not a matter of plain error, if error at all. No unique circumstances in the trial which might have made the instruction error here are pointed out, and we find none. The trial appears to have been well conducted by both sides, even though each might now claim it could make a more effective presentation on retrial.

█ Finally, Giacalone invites us tó hold that the charges delivered by the court were coercive because of the relatively short period of time which elapsed between the time the jury received the supplementary instruction and the time it returned the verdict, relying upon *United States v. Petersen,* 513 F.2d 1133, 1136 (9th Cir. 1975). In *Harris, supra,* our court suggested that the brief interval between the giving of the *Allen* charge and the return of a verdict may demonstrate the coercive effect of the charge. 391 F.2d at 356. The ABA Standards Relating to Trial by Jury (Approved Draft 1968), while generally critical of *Allen* charges, dispute the logic of the view that an *Allen* charge may or may not be considered coercive depending upon the speed with which a verdict is reached. "[I]t is difficult to accept a rule which in effect tells a judge that his instruction may be reversible error depending upon what happens after he has given it." ABA Standards, *supra,* Commentary to § 5.4(b) at

---

10. Although the opinion in *Kawakita* did not expressly address the propriety of the *Allen* charge delivered by the trial court, it noted that "[o]ther alleged errors . . . are either insubstantial or so adequately disposed of by the Court of Appeals that we give them no notice . . . ." 343 U.S. at 744, 72 S.Ct. at 966. One such claim of error discussed at length by the Ninth Circuit involved the *Allen* charge. *See* 190 F.2d 506 at 521–28.

11. The trial court acquiesced in defense counsel's suggestion to tell the jury that "[i]t is important that [this lawsuit] be *disposed of"* rather than *"decided." See United States v. Harris,* 391 F.2d 348, 356–57 (6th Cir.), *cert. denied,* 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145 (1968) (disapproving the word "decided"

and noting a preference for the phrase "disposed of").

12. Thus, the trial court instructed:

A trial of a lawsuit is an expensive process and is burdensome upon the litigants. All parties have been here, and have prepared for trial, and have spent time before you, and have presented their case as well as they can.

Like all cases, the problem must be disposed of at some time. So far as I can tell, there seems to be no reason why another trial would not be equally as expensive or burdensome as the trial you have been through. It does not appear that another trial could be more exhaustively, or more completely tried as has been this trial.

13. *See* note 12 *supra.*

154. The speed with which a jury may reach a verdict following the giving of the charge cannot be considered in determining whether the given charge was improper as coercive when given, although it might tend to indicate whether an instruction deemed improper was or was not harmless. We find no reversible error in the instructions complained of.

Within each of the three foregoing general areas of complaint, appellant has interposed other assertions of error and arguments concerning them, all of which we have reviewed but found to be without merit.

Affirmed.