99 F.3d 1138
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CENTRAL ON LINE DATA SYSTEMS, INC., Plaintiff-Appellant,
Cross-Appellee,
v.
FILENET CORPORATION, Defendant-Appellee, Cross-Appellant.
 No. 95-1016, 95-1054.
 United States Court of Appeals, Sixth Circuit.
 Aug. 23, 1996.
 
 Before: MERRITT, ENGEL, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Central On Line Data Systems, Inc., a Michigan corporation, brought suit for breach of contract and warranty against FileNet Corporation, a Delaware corporation, which in turn counterclaimed for breach of contract. The dispute arose out of the parties' agreement to have FileNet design and install a computer imaging system for use in COLDS's data processing business. The district court entered a judgment based on a jury verdict, awarding FileNet a net amount of $500,000 on its counterclaim, but also ordering FileNet to provide the source code for the computer system to COLDS. COLDS appealed, and FileNet cross-appealed, presenting a number of issues. As we will explain, we conclude that the district court's judgment should be affirmed in all respects.
 
 I.
 
 2
 COLDS provides data processing services for a parent company involved in the trucking business. Each day the parent company generates thousands of documents, such as bills of lading, delivery receipts, and invoices, and faxes them to COLDS. COLDS stores images of the faxed documents to be retrieved when needed in the billing and collection process.
 
 
 3
 FileNet manufactures computer imaging systems. After pursuing COLDS as a customer for several years, and after a fairly lengthy negotiation and wooing process, FileNet entered into a contract with COLDS in 1989, in which FileNet agreed to design and install a computer imaging system for COLDS to process and store computer digital images of its bills of lading and other documents. The purchase price was $2.2 million.
 
 
 4
 The agreement titled itself a "Turnkey Master Agreement," defining "turnkey" as meaning that
 
 
 5
 FileNet shall study, design, make specifications, deliver, install, modify, test and maintain the equipment that COLDS has ordered, and have it perform and work as a unit or system including but not limited to hardware and software and all custom system development. The system shall be turned over to COLDS in full operation and shall be functional and comply with the specifications and requirements of COLDS as defined in the respective Schedules.
 
 
 6
 The agreement explicitly included the referred-to schedules as part of the agreement, all of which were "deemed representation[s] and warranties of FileNet." The term "perform" was defined as meaning "that equipment operates, is useable without defect, all component parts are and/or System is working, has passed acceptance tests, and performs to its through put required by COLDS." "Throughput" is the ability of a system to process data within a certain time frame. FileNet further warranted that it was "familiar with the intended use by COLDS of the System, as described in the appropriate Schedule, and that the System and its components are suitable for and shall satisfy the requirements thereof in all respects." FileNet also specifically warranted that "the Equipment and Systems shall perform to all specifications represented by FileNet published literature or described in the respective Schedules and Proposal attached to this Agreement, and ... that Equipment and Systems are fit for the general and particular purpose for which they have been designed, fit and sold to COLDS." Counterbalancing FileNet's extensive warranties was COLD's representation that it would "be responsible for assuming the proper use, management and supervision of the Equipment, System and programs, audit controls, operating methods and office procedures and for establishing all proper check points necessary for the intended use of the Equipment and/or Systems." The agreement contained an explicit damages limitation with respect to both parties' remedies:
 
 
 7
 Filenet's liability under or for breach of this Agreement shall be limited to its obligation to repair or replace the Equipment as set forth in this Agreement. In no event shall COLDS and/or Filenet be liable for loss of profits, consequential or incidental damages, except when such a loss of profits or consequential or incidental damages is due to gross negligence and/or misconduct by COLDS or Filenet employees or subcontractors.
 
 
 8
 The parties focus extensively on paragraph CC.5 of the agreement, which sets forth the circumstances under which the parties had a right to terminate the agreement. It reads as follows:
 
 
 9
 Filenet will and shall produce a full scale specification and list of all Equipment, functions and through put capabilities of the entire System.... If Filenet and COLDS cannot agree on the specifications for any schedule that schedule will be terminated and Filenet shall return all monies and COLDS shall return all equipment related to the terminated schedule and both parties will continue with the remaining schedules.
 
 
 10
 ....
 
 
 11
 Should any cancellation occur, whether caused by above stated defaults or other defaults as stated in this Agreement, Filenet shall do everything in its power to prevent interruption of COLDS imaging. Filenet warrants that a decision[ ] made by COLDS to cancel this Agreement shall not cause any interference with any other data processing and imaging systems offered or not by Filenet, affiliates and/or competitors.
 
 
 12
 FileNet argues that the first paragraph demonstrates that its obligations under the agreement were limited by the scope of the schedule specifications. COLDS argues that the second paragraph demonstrates FileNet's obligation to provide it with the computer source code to enable it to continue using the system if their relationship deteriorated.
 
 
 13
 Following execution of the agreement, FileNet, working with COLDS, developed precise specifications for the system; those specifications are set forth in the schedules referred to by the agreement. The agreement also set forth certain testing specifications to determine whether the system functioned as required, and provided that after passing the particular tests, the system "shall be accepted" by COLDS. Over time, the system was developed in accordance with the specifications, and passed the tests. Although COLDS complained about the system's performance as will be detailed below, COLDS employed the system at some level for a period of four years. COLDS subsequently replaced the FileNet system with a technologically more advanced system.
 
 
 14
 The parties quarry in this appeal over whether FileNet warranted simply and generally to satisfy COLDS in all reasonable aspects, or whether it limited itself to meeting the objective criteria delineated in the schedules. It is COLDS's position that the agreement is a "satisfaction contract," such that FileNet was obligated to meet COLDS's response time needs and requirements regardless of the difficulty in doing so. FileNet contends that because the agreement posits objective criteria and specifications to be met, those specifications establish the limits of its obligations.
 
 
 15
 While COLDS presented no evidence of a single specification that was not met, or of any particular defect in the system, it did point to two general areas in which it claims the FileNet system was inadequate. First, it contends, the system did not meet COLDS's "throughput" needs. COLDS asserts that its throughput needs were, in some instances, a "standard one hour turnaround time," and in other special instances, a "15 minute turnaround time." In other words, an entire document needed to be "processed through completion of data entry within the one hour or 15 minute time limit." The system was designed with the anticipation that the data entry phase of the process would take approximately 2.4 minutes per document, and there was testimony that the average data processor was performing at that rate. COLDS contends that the failure to meet its turnaround time needs was, therefore, shown to be attributable to the FileNet system itself. In support of its claims, COLDS pointed to evidence of "slow painting on the screens." Because a data processor must wait until a screen is fully painted to perform the next function, COLDS complained that the slowness "was impacting their ability to get their bills of lading processed in the window in which they had to process them." In addition to the alleged processing speed problems, there was testimony that the FileNet system prevented COLDS's printer personnel from achieving their printing needs. COLDS claims that, because of the system's deficiencies, it was forced to remove 40% of its document processing from the FileNet system and use alternative methods.
 
 
 16
 FileNet contends that the problems with processing speed were attributable solely to the skill, or lack thereof, of COLDS's data processors, and the manner in which COLDS used the system. Thus, the problems were outside of FileNet's control, and did not constitute a breach of warranty. It contends--and presented evidence to this effect--that its hardware was able to service the workload. FileNet suggests that COLDS's dissatisfaction stemmed from COLDS's desire to get FileNet to upgrade its system, free of charge, to be compatible with systems developed two years after the parties entered into their contract.
 
 
 17
 In any event, whatever the initial source of disagreement, COLDS eventually stopped making payments under the contract, and this litigation followed.
 
 B.
 
 18
 COLDS's complaint contained counts for breach of contract, breach of express and implied warranties, fraud and deceit, and declaratory relief. FileNet, in turn, counterclaimed for the unpaid contract price. FileNet filed a motion for partial summary judgment on COLDS's fraud count, which the district court granted. The case then proceeded through discovery and to trial on the remaining claims.
 
 
 19
 At trial, the parties presented testimony with respect to their damages. Andre Levesque, of COLDS, testified that in order to convert some 20 million images already in the FileNet system to the new system which replaced it, COLDS needed the FileNet source code; in the absence of the source code, the images could not be translated from one system to another. COLDS's financial expert testified that it would cost COLDS approximately $500,000 to have the actual conversion performed.
 
 
 20
 The expert also testified that COLDS sustained total damages, including incidental and consequential damages, in a range of approximately $12 million to almost $16 million. This included some $3 million that was paid to FileNet for the system; some $2 to 5 million for the "value of contract differences" between the contract with FileNet and the competitor that provided the replacement system; some $3 million to acquire a new system; another $3 million to maintain and operate the new system; and some $100,000 or so in unspecified maintenance costs on the FileNet system.
 
 
 21
 The damages claimed by FileNet were simply the amount of the contract as yet unpaid by COLDS. A representative from FileNet testified that COLDS owed FileNet $1,000,085, with interest in the amount of $470,000, for an approximate total of $1.5 million. COLDS's expert testified that COLDS owed FileNet $816,163 under the contract.
 
 
 22
 Following trial, the jury was presented with a form for a general verdict accompanied by answers to interrogatories, pursuant to Fed.R.Civ.P. 49(b). It concluded that "FileNet breach[ed] the agreement or ... express or implied warranties to COLDS"; that the breach caused damage to COLDS; that the Master Agreement limited COLDS's right to recover damages, and that the limitation did not fail of its essential purpose; but that COLDS was nonetheless entitled to damages for the breach in the amount of $500,000, that is, the amount necessary to convert the existing FileNet images to the new system. The jury also concluded that "the agreement require[d] FileNet to provide COLDS with the source code necessary to convert COLDS' images from the FileNet imaging system to the [new] imaging system." Finally, the jury concluded that COLDS breached its agreement with FileNet; that the breach caused damage to FileNet; and that "the amount of damage to FileNet caused by COLDS' breach" was $1 million.
 
 
 23
 Following the verdict, the court subtracted the $500,000 awarded by the jury to COLDS from the $1 million awarded to FileNet, and entered judgment for FileNet in the net amount of $500,000. It further ordered FileNet to "provide the source code to COLDS necessary for conversion of the COLDS' images." The parties then filed post-trial motions, in which FileNet asked for judgment as a matter of law, and COLDS asked for a new trial. The motions were denied by the court without explanation, and the parties each filed a timely appeal.
 
 II.
 A.
 
 24
 We first address COLDS's argument that the district court erred in granting summary judgment to FileNet, dismissing COLDS's fraud claim. This court conducts the same de novo review of a district court's grant of partial summary judgment as it does of a court's summary judgment as to the whole of a case. Schachner v. Blue Cross & Blue Shield, 77 F.3d 889, 892 (6th Cir.1996). Thus, the district court's grant of partial summary judgment should be affirmed if " 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law' " with respect to the claims at issue. Id. (quoting Fed.R.Civ.P. 56(c)).
 
 
 25
 The essence of COLDS's fraud claim is as follows:
 
 
 26
 FileNet's representations to COLDS were false when FileNet made them. The true facts were that FileNet had not studied the imaging needs of COLDS and could not provide COLDS, on a turnkey basis, with a fully integrated imaging hardware and software system, with all related equipment, to meet the special specifications and requirements of COLDS, which would provide COLDS with a cost-effective and efficient means of processing the data provided to COLDS by COLDS' affiliates and associates.
 
 
 27
 The elements of fraud, under Michigan law, are as follows:
 
 
 28
 "(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury."
 
 
 29
 Scott v. Harper Recreation, Inc., 506 N.W.2d 857, 860 n. 3 (Mich.1995) (quoting Hi-Way Motor Co. v. International Harvester Co., 247 N.W.2d 813 (Mich.1976)). It is well-established in Michigan that the misrepresentations alleged in a fraud claim cannot be mere "future promises," as opposed to misrepresentations of present or past fact. While "future promises can form the basis of an action for breach of contract," they "cannot give rise" to a claim for fraud. Id. at 860 n. 4 & 860. Instead, "[t]he general rule is 'that an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud.' " Kassab v. Michigan Basic Property Ins. Ass'n, 491 N.W.2d 545, 554 (Mich.1992) (Boyle, J., dissenting) (quoting Hi-Way Motor, 24 N.W.2d 813). Likewise, the misrepresentations cannot be mere "opinion" or "puffing." Scott, 506 N.W.2d at 860.
 
 
 30
 The district court reasoned that the alleged misrepresentations relied on by COLDS were either mere "promises to render future performance" or expressions of opinion. On appeal, COLDS asserts that the district court erred in this conclusion, arguing that it produced evidence showing that FileNet falsely represented that it had the experience and capability to provide COLDS with an integrated imaging system that would meet COLDS's needs, when in reality, the system was too slow. COLDS also suggests that, to the extent Michigan ever had a rule that future promises were not actionable in fraud claims, this rule has been abandoned. This latter argument is clearly without merit. See Scott, 506 N.W.2d at 860.
 
 
 31
 FileNet responds to COLDS's assertions with a number of arguments, without relying on the district court's rationale. While we agree with FileNet that the district court properly dismissed COLDS's fraud claims, we do so not for the reasons advanced by FileNet, but for the reason articulated by the district court. Contrary to COLDS's suggestions, it has no evidence, nor has it ever alleged, that FileNet misrepresented its experience and qualifications. COLDS does not, for example, point to a statement by FileNet that it had created similar systems in the past, and then show that this statement is false. COLDS also cannot show that FileNet represented it could produce a system with particular, specific characteristics, but that the system FileNet produced did not and could not possess the promised characteristics. Likewise, COLDS does not allege and cannot show that FileNet represented that it had a particular existing product that met COLDS's needs. Instead, all COLDS alleges is that FileNet promised generally that it would, and expressed its general belief that it could, develop such a product in the future, without either party yet having sketched out the specific requirements. Irrespective of whether this statement is false--that is, irrespective of whether FileNet actually developed an adequate system--the statement is not the type that amounts to a misrepresentation under Michigan fraud law, as it must be characterized simply as a "future promise" and mere "opinion" or "puffing."
 
 B.
 
 32
 We now turn to FileNet's argument that it was entitled to judgment as a matter of law because COLDS did not produce sufficient evidence of breach of warranty. In a suit premised on diversity jurisdiction, such as this, we review the district court's decision to grant or deny a judgment as a matter of law by applying the state law standard. Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 726 (6th Cir.1994). In reviewing such motions, Michigan appellate courts "examine the testimony and all legitimate inferences that may be drawn in the light most favorable to the plaintiff." Pakideh v. Franklin Commercial Mtg. Group, Inc., 540 N.W.2d 777, 780 (Mich.Ct.App.1995). "If reasonable jurors could honestly have reached different conclusions," then the court may not "substitute its judgment for that of the jury." Id.
 
 
 33
 FileNet contends that the agreement obligated FileNet only to install a system in conformance with the written specifications. So long as the specifications were satisfied, COLDS's subjective dissatisfaction was irrelevant.
 
 
 34
 In its complaint, COLDS alleged that FileNet breached both express and implied warranties, and the jury verdict did not distinguish between the two types. If a buyer has accepted goods, as COLDS did here, then the burden of proof is on the buyer to establish a claimed breach of warranty. MICH.COMP.LAWS ANN. § 440.2607(4). In order to establish a breach of warranty claim, whether an express or implied warranty is involved, a "plaintiff must trace the defect into the hands of the defendant" by "showing that the defect was attributable to the defendant." Marderosian v. Stroh Brewery Co., 333 N.W.2d 341, 343 (Mich.Ct.App.1983). But in order to prove a defect, it is not necessary under Michigan law for a buyer to present direct evidence of a defective condition. Severn v. Sperry Corp., 538 N.W.2d 50, 54 (Mich.Ct.App.1995). Instead, "a jury may infer the existence of a defective condition from circumstantial evidence alone." Id. (citing Holloway v. General Motors Corp. (On Rehearing), 271 N.W.2d 777 (Mich.1978); Caldwell v. Fox, 231 N.W.2d 46 (Mich.1975)). It follows, then, that it is not necessary for the buyer to identify a specific defect to establish his claim. Id.
 
 
 35
 We note, first, our agreement with FileNet's contention that the contract at issue cannot properly be considered a "satisfaction contract." While we find no case law discussing the concept of a "satisfaction contract" under the UCC, and the parties have failed to cite any, we presume that, under the UCC, a satisfaction contract is a contract in which the seller expressly warrants to perform to the satisfaction, objective or subjective, of the buyer. Cf. Cacavas v. Zack, 203 N.W.2d 913, 915-16 (Mich.Ct.App.1973). There is no such warranty here. To the extent the contract declares that FileNet would create a system meeting "the specifications and requirements of COLDS," that pledge is consistently limited by an additional provision that the specifications and requirements will be only those "defined in the respective Schedules." In the absence of an explicit representation that FileNet's performance would be assessed solely by reference to COLDS's satisfaction, we must decline to treat this agreement as a "satisfaction contract."
 
 
 36
 Nonetheless, we disagree with FileNet that COLDS's evidence was inadequate to prove its claim. COLDS was entitled, under Michigan law, to rely solely on circumstantial evidence; it simply was not required to point to a specific defect. Severn, 538 N.W.2d at 54. COLDS produced evidence that there was "slow painting" on the screen, and that its throughput needs were not met, as well as evidence that the printing capabilities were inadequate. FileNet's argument that COLDS should have been required to produce expert testimony with regard to computer systems in order to prove its claims has no foundation under Michigan law, and it is not this court's place to invent such a requirement on Michigan's behalf. We note, moreover, our view that promulgating a hard-and-fast requirement for such testimony in particular cases would be imprudent. Cf. Latham & Assoc. v. William Raveis Real Estate, Inc., 589 A.2d 337, 339 (Conn.1991). Such a requirement finds no support in Article VII of the Federal Rules of Evidence, and would not be in keeping with the overall discretion accorded to a trial court to control the "mode and order of ... presenting evidence." Fed.R.Civ.P. 611(a). In not presenting expert evidence in a highly technical case, a party simply runs the risk of not persuading a jury of the veracity of its claims.
 
 
 37
 We reject, finally, FileNet's argument that because COLDS breached its obligation to pay, and because COLDS refused to accept maintenance provided by FileNet under the terms of the contract, COLDS's own substantial breaches bar its right to claim damages against FileNet. See Sentry Ins. v. Lardner Elevator Co., 395 N.W.2d 31, 34 (Mich.Ct.App.1986); see also Butterfield v. Metal Flow Corp., 462 N.W.2d 815, 818 (Mich.Ct.App.1990). Here, while the jury determined that COLDS breached the contract, there was no determination whether COLDS was the first breacher, nor whether the breach was substantial. Accordingly, this argument provides no ground for striking COLDS's claim.
 
 C.
 
 38
 COLDS points to a number of alleged errors by the district court that in the aggregate, it contends, warrant the grant of a new trial. We disagree.
 
 
 39
 We review the district court's decision not to grant a new trial for an abuse of discretion. See Porter v. Lima Memorial Hosp., 995 F.2d 629, 635 (6th Cir.1993). In diversity actions, "the question of whether a new trial should be ordered is determined with reference to federal procedural law." Id. Fed.R.Civ.P. 59(a) confirms the district court's traditional
 
 
 40
 power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict.... A new trial may be granted ... if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course.
 
 
 41
 Smith v. Transworld Drilling Co., 773 F.2d 610, 612-13 (5th Cir.1985) (footnotes omitted); see Morvay v. Maghielse Tool & Die Co., 708 F.2d 229, 233 (6th Cir.), cert. denied, 464 U.S. 1011 (1983).
 
 1.
 
 42
 First, COLDS complains that the district court erred in refusing to dismiss a juror whose husband was involved in a lawsuit in which the opposing party was represented by the Detroit firm of Dykema Gossett, which is also the firm that represents COLDS. COLDS contends that the relationship between this juror, Juror No. 6, and Dykema Gossett tainted the entire jury.
 
 
 43
 What COLDS neglects to acknowledge however, is that neither the attorneys nor the court thought to question the venire as to whether they had ever heard of the law firms involved in this case. It was, therefore, a complete surprise to all when, after hearing a witness refer to the firm of Dykema Gossett, Juror No. 6 informed the court clerk that she thought "her husband [was] being sued by Dykema Gossett." Upon questioning by the court, the juror indicated that she did not think the involvement of Dykema would "have an [e]ffect" on her "ability to sit as a fair and impartial juror." She reaffirmed, when asked in several different ways, that Dykema Gossett's involvement made no difference to her approach to this case. Although Juror No. 6 had told several jurors that "one of the firms w[as] involved in the litigation that [her] husband was going through," the other jurors told her that it "d[id]n't sound like anything to them."
 
 
 44
 In a subsequent colloquy with the court, the attorneys for COLDS requested either a mistrial or that the court decide the case as a bench trial. COLDS refused to take a position on any remedy short of those. Although refusing a mistrial, the district court nonetheless dismissed Juror No. 6, simply to dispel any possibility of prejudice. The court instructed the jury, however, that the dismissal was made at the choice of the court alone, not of the parties.
 
 
 45
 Juror No. 6's initial failure to disclose her involvement with Dykema was the result neither of deliberate concealment nor even innocent error. She failed to disclose this information because no one ever asked her about it. Since the information was not important enough to inquire about during voir dire it is unlikely that such information, when learned, could even be the basis for requiring the dismissal of that juror for cause, let alone dismissing the entire jury panel and starting anew. Further, in determining whether a juror should be stricken for cause, the juror's statement that he is unbiased should be accorded significant weight. See United States v. Giacalone, 588 F.2d 1158, 1162-64 (6th Cir.1978), cert. denied, 441 U.S. 944 (1979). In sum, COLDS's argument is utterly lacking in merit.
 
 2.
 
 46
 At trial, COLDS attempted to introduce into evidence a report by its technical expert detailing alleged problems with the FileNet system; it did not, however, call the expert himself to testify. On appeal, COLDS argues that the district court erred in excluding the report. Although acknowledging that the report is hearsay, COLDS alleges that FileNet waived any objection because it had listed the report among its own exhibits, and suggests that because of the waiver, the district court was required to admit the report.
 
 
 47
 FileNet exerts much energy arguing that it did not waive its objection; that COLDS never made a showing that its expert witness was unavailable; and that the report did not satisfy the standards for expert testimony under Fed.R.Evid. 702. These arguments are misguided. The report was properly excluded because it was hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Generally, "hearsay is not admissible" in federal courts, unless otherwise explicitly provided by the Federal Rules of Evidence. Fed.R.Evid. 802. FileNet points to no viable exception to the rule in this case. It cannot be error to refuse to admit that which is not admissible under the Federal Rules of Evidence. COLDS's argument in this regard therefore must fail.
 
 3.
 
 48
 At trial, COLDS proposed the following jury instruction:
 
 BREACH OF WARRANTY--ACCEPTED GOODS
 
 49
 Where the buyer has accepted goods and given notification, he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
 
 
 50
 The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
 
 
 51
 In a proper case any incidental and consequential damages under these instructions may also be recovered.
 
 
 52
 COLDS cited MICH.COMP.LAWS ANN. § 440.2714 in support of its request, the language of which is largely identical to the proffered instruction. This instruction was not given by the court for reasons that do not appear in the record. Instead, the court gave an instruction that explained, in detail, the circumstances defining acceptance, and then stated, broadly, that "acceptance itself does not of itself impair any other remedy for non-conformity," and noted that an accepting buyer "is barred from any remedy unless the buyer notifies the seller of breach within a reasonable time after he discovers or should have discovered any breach." Elsewhere, in describing express and implied warranty damages, the district court further clarified that COLDS was entitled to damages for breach of warranty even if it accepted the goods. Nowhere, however, did the district court explicitly instruct as to the "measure of damages" for breach of warranty when goods are accepted.
 
 
 53
 COLDS argues that the jury instructions were flawed because the district court omitted COLDS's proposed damages instruction, and because the jury received no guidance as to the proper measure of damages if it concluded that COLDS had accepted the FileNet imaging system. Relatedly, COLDS argues that the jury's award of $500,000 to COLDS was insufficient and against the clear weight of the evidence, because, COLDS claims, the evidence showed that both the data processing and the retrieval portions of the imaging system were inadequate to meet COLDS's needs.
 
 
 54
 "The purpose of jury instructions is to inform the jury on the law and to provide proper guidance and assistance in reaching its verdict. The trial court enjoys considerable latitude in selecting appropriate language, the test being whether the instructions as a whole correctly state the applicable law." Bucyrus-Erie Co. v. General Products Corp., 643 F.2d 413, 418 (6th Cir.1981). Our role in evaluating COLDS's weight-of-the-evidence argument is to
 
 
 55
 compare the opposing proofs, weigh the evidence, and set aside the verdict if it is [our] opinion that the verdict is against the clear weight of the evidence. [We] should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences could have been drawn or because other results are more reasonable.
 
 
 56
 Porter, 995 F.2d at 635 (citation omitted).
 
 
 57
 We conclude that both of COLDS's arguments are lacking in merit. First, the jury instructions, read as a whole, gave an adequate description of the damages available for a breach of warranty, and also made it clear that acceptance alone did not bar a remedy for breach of warranty. Second, the damages actually awarded were reasonable. While it is true that COLDS produced an expert witness who testified that COLDS had incurred massive costs in switching to a new system, and while it is true that the figures testified to by that expert were not directly contested, it is also true that there is evidence supporting a jury rejection of COLDS's claim that the costs were incurred as a result of FileNet's breach of warranty. It was FileNet's theory at trial that COLDS "traded up" to a new system simply because it used technology two years more advanced than the FileNet system; that is, the trade-up occurred because COLDS coveted a fancier system, not because of flaws in the FileNet system. Similarly, the jury concluded not only that FileNet breached its warranties to COLDS but that COLDS breached its contract with FileNet. The jury may well have decided that COLDS's breach offset any breach by FileNet. Further, FileNet's attorneys extensively cross-examined the expert, and may have convinced the jury that the numbers he testified to were purely speculative or duplicative. Finally, the jury may have been sold on another of FileNet's theories: that COLDS benefitted substantially from the FileNet system, in lower labor costs and increased efficiency, even accepting COLDS's argument that the system did not perform up to par. In sum, it is quite clear that the jury award was adequately supported by the evidence.
 
 D.
 
 58
 FileNet argues that the district court erred in its "interpretation" of the jury verdict. According to FileNet, the jury had uncontroverted evidence that FileNet was entitled to $1.5 million. Therefore, it reasons, the jury award of $1 million to FileNet and $500,000 to COLDS could only rationally be interpreted to mean that the jury intended for FileNet to receive $1 million net; that is, when it wrote that FileNet should receive an award of $1 million, the jury had already subtracted the award of $500,000 to COLDS from a $1.5 million award.
 
 
 59
 "Most federal cases are resolved by a general verdict wherein the jury finds for the plaintiff or defendant." Portage II v. Bryant Petroleum Corp., 899 F.2d 1514, 1519 (6th Cir.1990). But Federal Rule of Civil Procedure 49 provides alternatives to the general verdict. Under Fed.R.Civ.P. 49(b), the district court may "require a jury to return a general verdict accompanied by answers to written interrogatories upon one or more issues of fact, the decision of which is necessary to the verdict. The form of the interrogatories submitted to the jury is within the discretion of the trial judge." Tennessee Consolidated Coal Co. v. United Mine Workers, 416 F.2d 1192, 1200 (6th Cir.1969), cert. denied, 397 U.S. 964 (1970). On appeal, a district court's interpretation of a verdict rendered pursuant to Fed.R.Civ.P. 49 is reviewed for an abuse of discretion. See P & L Constr., Inc. v. American Norit Co., 5 F.3d 133, 138 (5th Cir.1993); cf. Portage II, 899 F.2d at 1524.
 
 
 60
 It is well-settled that if, after answers to special interrogatories are read, a party does not object to the discharge of the jury or raise any issue with respect to the jury's responses, that party should be deemed to have waived any objection as to inconsistency, ambiguity, or lack of clarity in the answers. See Lockard v. Missouri Pac. R.R. Co., 894 F.2d 299, 304 (8th Cir.), cert. denied, 498 U.S. 847 (1990); White v. Celotex Corp., 878 F.2d 144, 146 (4th Cir.), cert. denied, 493 U.S. 964 (1989). "The purpose of the rule is to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury. This prevents a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict." Lockard, 894 F.2d at 304 (citation omitted).
 
 
 61
 We have several reactions to FileNet's argument. First, there is nothing ambiguous or unclear about the jury verdict. FileNet's argument is premised solely on wishful thinking, which alone cannot serve to undermine the patently straightforward verdict returned by the jury. While FileNet's theory is certainly not impossible, it is also not supported by anything beyond FileNet's creative speculation.
 
 
 62
 Second, contrary to FileNet's claims, the jury's verdict is supported by the evidence: COLDS's expert testified that COLDS owed FileNet slightly less than $1 million, and FileNet's witness testified that COLDS owed FileNet slightly more than $1 million, plus interest. The jury may well have chosen to compromise between the two figures, and chosen to forego an interest award. On the other hand, the jury may have erred in its interpretation of the verdict form, as FileNet suggests. There is no way to know, and given that fact, the district court did not abuse its discretion in its entry of judgment. In that regard, we emphasize that FileNet failed to raise this issue at the appropriate time. If it viewed the form as ambiguous in any way, it should have said so when the jury was still impanelled and available to render any necessary clarification. Given the thinness of FileNet's argument and its failure to raise the point timely, it would be unjust to require another trial on the damages issue.
 
 E.
 
 63
 FileNet's final argument is that the district court erred in entering an injunction compelling FileNet to provide COLDS with its source code to convert the images from the FileNet system to COLDS's new replacement system. It contends that COLDS was not entitled to the source code under the contract, and also that COLDS had an adequate legal remedy because it received a $500,000 award, which was all that was required to convert the images. This court reviews a district court's grant of a permanent injunction for an abuse of discretion, reviewing any underlying factual findings for clear error and any underlying legal conclusions de novo. See Hodgson v. William Len Hotel Co., 436 F.2d 1083, 1084 (6th Cir.1971) (per curiam ); see also Horenstein v. Secretary of HHS, 35 F.3d 261, 263 (6th Cir.1994).
 
 
 64
 In our view, FileNet's entire argument is premised on a version of the facts and interpretation of the contract that are skewed and inaccurate. First, there is evidence in the record, albeit somewhat ambiguous, that it is necessary for COLDS to have both the source code and $500,000 in order to convert its FileNet images to the new system. That is, the award of $500,000 along with the source code does not represent a double recovery; $500,000 is the cost of converting the system after COLDS receives the source code, but no amount would suffice to convert the system in the absence of the source code. Although there was never any one witness who explicitly stated this, it is certainly an inference one can reasonably draw from the expert witness's testimony, as well as the testimony of COLDS employees.
 
 
 65
 Second, paragraph CC.5 of the contract provides a legal basis for the district court to conclude that FileNet was obligated to provide the source code to COLDS despite their falling out. FileNet warranted that any termination or cancellation of the contract by COLDS would "not cause any interference with any other data processing and imaging systems offered or not by FileNet, affiliates and/or competitors." There is evidence that, without the source code, COLDS cannot utilize any of the FileNet images it acquired over a four-year period, which certainly would constitute an "interference" with their data processing. In so interpreting the contract, we note that FileNet has never addressed the applicability of paragraph CC.5, instead focussing its attention on a contractual provision relating to the escrow of the source code, on which COLDS has explicitly stated it does not rely. We may presume from FileNet's silence that it agrees with COLDS's explanation of the meaning of paragraph CC.5.
 
 III.
 
 66
 Finding no error in the district court's proceedings, the judgment is AFFIRMED.