**UNITED STATES of America, Appellee,**

v.

**Glen REED, Appellant.**

No. 94–2361.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1994.

Decided Feb. 8, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 21, 1995.

Brenda Horn Austin, Fayetteville, AR, for appellant.

Paul Kinloch Holmes III, U.S. Atty., Fort Smith, AR, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, REAVLEY,[*] Senior Circuit Judge, and McMILLIAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Glen Reed appeals from a final judgment entered in the United States District Court[1] for the Western District of Arkansas upon a jury verdict finding him guilty on three counts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2.[2] The district

---

\* The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

**1.** The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

**2.** The jury also found defendant guilty on a fourth count, for theft of government property, in violation of 18 U.S.C. § 641. The district court granted defendant's motion for judgment of acquittal on the theft count. *United States v. Reed,*

court sentenced Reed to twenty-four months imprisonment, two years supervised release, and a special assessment of $150.00. Reed was also ordered to make restitution to victims in the amount of $193,301.29. For reversal, Reed argues that the district court erred in denying his motion for judgment of acquittal on the mail fraud counts on grounds of insufficiency of the evidence. *United States v. Reed*, 851 F.Supp. 1296 (W.D.Ark. 1994) (*Reed*) (granting in part and denying in part Reed's motion for judgment of acquittal). For the reasons discussed below, we affirm.

Reed, an accountant and former certified public accountant, was indicted with Ezra Earl Maglothin, Jr., an attorney, on charges of mail fraud and theft of government property based upon allegations that they aided and abetted each other in a scheme to steal money from Maglothin's clients by fraudulently converting to their own use client money deposited in a trust account maintained by Maglothin at the Bank of Fayetteville (the attorney trust account). Upon motion by Maglothin, the district court severed Reed and Maglothin's trials, and ordered that they would have completely different juries. Maglothin's trial began on February 28, 1994; the jury acquitted Maglothin on all counts against him.[3] Reed's trial began on March 3, 1994; the jury found Reed guilty on all counts against him, which included three counts of mail fraud and one count of theft of government property. Reed filed a motion for judgment of acquittal, which the district court granted in part and denied in part. *Id.* The district court acquitted Reed on the theft count, but upheld the jury's verdict as to the mail fraud counts. *Id.* at 1306–09. Reed appealed.

■ Reed argues that the evidence was insufficient as a matter of law for the jury to conclude that he and Maglothin aided and abetted each other in a scheme to defraud Maglothin's clients. He further argues that the evidence was insufficient as a matter of law for the jury to conclude that mailings of

bank statements regarding the attorney trust account were incident to an essential part of the alleged scheme. *See Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1447–48, 103 L.Ed.2d 734 (1989) (*Schmuck*) (mail fraud does not require that use of the mails be an essential element of the scheme, but does require that mailing be "incident to an essential part of the scheme") (citing *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916)). In response, the government argues that there was sufficient evidence from which the jury reasonably could have inferred that Reed and Maglothin assisted each other in their scheme to defraud Maglothin's clients, that the attorney trust account was the primary vehicle for their scheme, and that they used bank statements regarding the attorney trust account to monitor the account's balance in order to avoid overdraft and consequent suspicion or detection. Thus, the government maintains, use of the bank statements was essential to Reed and Maglothin's scheme, and the mailings of the statements were incident to that use.

At trial, the government presented the testimony of several of Maglothin's former clients, among other witnesses. The district court's order summarizes their testimony in elaborate detail. *Reed*, 851 F.Supp. at 1299–1305. As the district court's summary makes abundantly clear, there was ample evidence from which the jury could conclude that Maglothin and Reed both engaged in a scheme to defraud Maglothin's clients, and that the attorney trust account played a pivotal role in that scheme. *Id.* at 1299–1305, 1308. Therefore, the only genuine issue on appeal is whether or not the jury reasonably could have inferred from the evidence that Maglothin and Reed relied upon the attorney trust account bank statements to assist them in carrying out their scheme, thus supporting the conclusion that the mailings of the bank statements were incident to an essential part of the scheme. Upon review of the evidence

---

851 F.Supp. 1296, 1309–12 (W.D.Ark.1994) (*Reed*).

3. In addition to the mail fraud and theft of government property counts, Maglothin was also charged with multiple counts of wire fraud and money laundering. *Reed*, 851 F.Supp. at 1297.

presented at trial and the applicable case law, we hold that the evidence was sufficient to support Reed's conviction on the mail fraud counts.

*Use of Mails Requirement*

Reed contends that, even assuming the existence of a scheme to defraud Maglothin's clients, the evidence failed to show that either he or Maglothin ever needed or used the bank statements to further their alleged scheme. He argues that the alleged fraud would have been complete at the time he or Maglothin cashed checks written on the attorney trust account and that it would have been immaterial to them whether, or at what time, the bank statements were mailed. Thus, he maintains, the mailings could not have been incident to an essential part of the scheme. *See United States v. Maze,* 414 U.S. 395, 402, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974) (mail fraud not established because scheme had reached fruition before mailing occurred and mailing was immaterial to the defendant's successful completion of the fraud); *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 150, 89 L.Ed. 88 (1944) (same).

■■■ In reviewing a challenge for sufficiency of the evidence, we view the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences that support the jury verdict. *United States v. Robaina,* 39 F.3d 858 (8th Cir.1994). Viewing the evidence in the present case most favorably to the government, it showed that Reed and Maglothin engaged in a scheme to defraud Maglothin's clients during a period from 1991 through 1993. Maglothin and Reed led Maglothin's clients to believe that the attorney trust account, maintained at the Bank of Fayetteville, was a trust account for the safekeeping of client funds. They deposited large sums of client money in the attorney trust account, at times without prior authorization from the client. The Bank of Fayetteville mailed Maglothin monthly statements showing the activity and balance in the attorney trust account. After Maglothin or Reed would deposit a client's money in the attorney trust account, they would both write checks on the account, frequently depleting it to a nominal balance.

According to Reed, himself, records for the attorney trust account were maintained in an "unusual" manner. For example, Reed would sometimes carry loose checks for the attorney trust account in his briefcase and would write checks on the account without contemporaneously recording the amount of the checks in the checkbook; on those occasions, he would simply tell Maglothin or another person in Maglothin's office that he had written checks and their amounts. Nevertheless, except for one time when the account had a negative balance of approximately three hundred dollars, the attorney trust account was never overdrawn during the years from 1991 through 1993.

In considering the evidence from the jury's perspective, the district court reasoned as follows.

[Reed and Maglothin] could not have been able to keep [their] scheme alive and to withdraw almost the exact amount of the funds available in the account if they had not had the bank statements showing the bank balance.

A reasonable juror could conclude that, if [Reed and Maglothin] had not known the bank balance through use of the bank statements, they would have regularly overdrawn the account in a substantial amount and the bank's attention would have been directed to this account, resulting either in an investigation or a closing of the account.

It is significant to note, as Mr. Maglothin admitted during his testimony, that the account was closed after it had been drawn down to a balance of only $34.27. Reasonable jurors might conclude that that was not happenstance but, instead, was part of the scheme and that the bank statements were an essential step in that scheme.

*Reed,* 851 F.Supp. at 1308. In other words, the district court reasoned that the jury could have found that Reed and Maglothin were able to maintain their fraudulent scheme without detection by relying in part on the bank statements to coordinate and fine-tune their withdrawals. Thus, the bank statements would have been essential to the ongoing success of their fraudulent operations. Recognizing this as a plausible inter-

pretation of the evidence, the district court held that the evidence was sufficient to support the verdict. *Id.* We agree. *See United States v. Erdman,* 953 F.2d 387, 389 (8th Cir.) (the verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to conclude guilt beyond a reasonable doubt), *cert. denied,* —— U.S. ——, 112 S.Ct. 3009, 120 L.Ed.2d 883 (1992).

Finally, we note that the district court's decision is supported by the applicable case law. Assuming that the jury did believe that Reed and Maglothin relied on the bank statements to keep their scheme alive, this case is analogous to *Schmuck.* In *Schmuck,* the defendant bought used cars and sold them to retail dealers at inflated prices by rolling back the cars' odometers. 489 U.S. at 707, 109 S.Ct. at 1445. To establish mail fraud, the government relied on the fact that the retail dealers had to submit title application forms to the Wisconsin Department of Transportation in order to transfer title to their customers, and those applications were typically submitted by mail. *Id.* at 711, 109 S.Ct. at 1447. The Supreme Court held that the mailings of the title applications were sufficiently related to the defendant's fraudulent scheme to be considered "incident to an essential part of the scheme." *Id.* at 712, 109 S.Ct. at 1448. The Supreme Court reasoned

> Schmuck's was not a "one-shot" operation in which he sold a single car to an isolated dealer. His was an ongoing fraudulent venture. A rational jury could have concluded that the success of Schmuck's venture depended on his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers.

*Id.* at 711–12, 109 S.Ct. at 1447–48. The Supreme Court held that a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, which did not reach fruition until the retail dealers resold the cars and effected transfer of title. *Id.* at 712, 109

S.Ct. at 1448. The defendant's scheme "would have come to an abrupt halt" if the dealers had not been able to resell the cars, which in turn depended on the smooth passage of title. *Id.* Thus, the Supreme Court reasoned, "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." *Id.*

Similarly, in the present case, a rational jury could have found that the monthly mailings of the attorney trust account bank statements were part of the execution of Maglothin and Reed's fraudulent scheme. The scheme "would have come to an abrupt halt" if Maglothin and Reed had not been able to maintain an account through which the money would flow, which in turn depended on the apparent legitimacy of their financial activities. Thus, although the bank statement mailings may not have contributed directly to the duping of Maglothin's clients, they were necessary to maintain a positive balance in the account, which in turn was essential to the perpetuation of Maglothin and Reed's scheme. *See also United States v. Freitag,* 768 F.2d 240, 243–44 (8th Cir.1985) (evidence was sufficient to support mail fraud conviction for check-kiting scheme where checks routinely sent by mailed were an essential element in the scheme, and cancelled checks and bank statements routinely sent by mail were "necessary to know and keep track of the accounting balances in each account"); *cf. United States v. Taylor,* 789 F.2d 618, 620–23 (8th Cir.1986) (evidence was insufficient to support mail fraud conviction where the charged mailings occurred after the fraud reached fruition and the mailings, such as notices of insufficient funds, actually demonstrated the banks' declining confidence in the defendant's finances).[4]

Accordingly, the judgment of the district court is affirmed.

---

**4.** In *United States v. Taylor,* 789 F.2d 618, 621 (8th Cir.1986), this court specifically distinguished the case at bar from cases involving

traditional check-kiting schemes where the "persistent mirage of having available credit" depends on use of the mails.