UNITED STATES of America,
Plaintiff–Appellee,

v.

Norman C. HARTSEL, Defendant–Appellant.

No. 98–3639.

United States Court of Appeals,
Sixth Circuit.

Submitted: Sept. 21, 1999

Decided and Filed: Dec. 16, 1999

Fritz Byers (briefed), Toledo, Ohio, N. Stevens Newcomer (briefed), Toledo, Ohio, for Appellant.

Stephen G. Sozio (briefed), OFFICE OF THE U.S. ATTORNEY, Cleveland, Ohio, for Appellee.

Before: BOGGS and DAUGHTREY, Circuit Judges; McKINLEY,* District Judge.

## OPINION

McKINLEY, District Judge.

The Defendant, Norman Hartsel, was convicted in the United States District Court for the Northern District of Ohio of mail fraud, 28 U.S.C. § 1341, and aiding and abetting the embezzlement of funds of a labor organization, 29 U.S.C. § 501(c). On appeal, Hartsel asserts that the district court erred in finding the receipt of mailed bank statements constituted a use of the mails under the mail fraud statute, and in concluding the embezzled funds were the funds of a labor organization. Hartsel also contends that the district court erred in denying his motion for recusal. Because we find that the receipt of the bank statements failed to satisfy the use of the mail requirement under the facts of this case, we must reverse the mail fraud conviction. However, in all other respects, we affirm the decision of the District Court.

### Facts

United Auto Workers Local 12 (Local 12) represents Chrysler Corporation em-ployees at Chrysler's Toledo, Ohio plant. Ronald Conrad (Conrad) served as the chairman of Local 12. Local 12 established a charitable fund in its constitution known as the Jeep Corporation, UAW Local 12 Employee's Charity Fund (Jeep Charity Fund). The employees represented by Local 12 contribute to this charity by authorizing deductions directly from their payroll checks. The Jeep Charity Fund qualified for tax-exempt status under 26 U.S.C. § 501(c)(3) of the Internal Revenue Code. While the union officers did not participate in preparing or signing the annual reports, tax returns or other required filings, the union completely controlled disbursements to the charities of its choice. Conrad authorized and signed most of the checks from the fund. Local 12 kept records of the fund's activity at its offices.

The Defendant, Norman Hartsel, was a practicing attorney in Perrysburg, Ohio. In his legal practice, Hartsel represented Dannie Johnson (Johnson), who owned a local Jeep dealership. Johnson sat on the boards of several local charities, but he became disenchanted with this position. Johnson asked Hartsel to establish a charity which he could direct and control. Thereafter, Hartsel established Stamp Out Hunger of Northwest Ohio (SOH) in January of 1992.

Conrad was approached by Johnson seeking a contribution for SOH from the Jeep Charity Fund. In April of 1992, SOH received the first of a series of checks from the Jeep Charity Fund. This check was dated April 7, 1992, in the amount of $10,000. Hartsel used these funds to establish a bank account at Mid–American Bank in the name of SOH. He was the only authorized signatory on the account. Furthermore, Hartsel directed the bank to mail all monthly statements, including the canceled checks, and any other information relative to the account to the address of his law firm. Hartsel received these statements

---

* The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

and filed them at his law offices. The FBI discovered the statements there during its search of his business.

After the deposit of this first check, the money quickly changed hands. Hartsel wrote checks to his law firm for $2,138.50 on April 17 and $3500 on April 24. On April 22, he wrote another check to TB3 Properties (TB3) for $4004.[1] Additionally, the government traced a September 21 payment from SOH to Hartsel's law firm to this initial deposit. In June of 1992, the Jeep Charity Fund issued another check for $4500. Harstel then wrote a check in this amount to TB3. In November and December of 1992, SOH received checks from the Jeep Charity Fund for $2000 and $500 respectively. Again, this money was paid out to TB3. In February of 1993, the Jeep Charity Fund provided a final check in the amount of $10,000. Of this amount, $7000 went to Hartsel's law firm and $2000 to TB3. Once this money was deposited into his various accounts, Hartsel used it to pay debts of his law firm or withdrew it for his personal use. Hartsel loaned some of this money to Johnson as a personal loan. Hartsel claims no knowledge that Johnson returned the money to Conrad as a kickback.

Following an FBI investigation, Hartsel was indicted for mail fraud and aiding and abetting the embezzlement of union funds. Conrad was also indicted for embezzlement from union funds and plead guilty. Hartsel waived his right to a jury trial and chose to represent himself despite lacking prior experience in the area of criminal law. Johnson testified at trial that he paid Conrad a kickback and that Hartsel knew of the scheme. Following the bench trial, the District Court found Hartsel guilty of both crimes. The District Court then de-

nied the Defendant's Motion for Judgment of Acquittal and the Defendant's Motion for a New Trial. Hartsel received a sentence of 15 months for each offense, to be served concurrently, two years of supervised release, a fine, restitution, and a special penalty assessment. Hartsel appealed the denial of his post-verdict motion for judgment of acquittal or a new trial.

### Standard of Review

■■■ Decisions denying a motion for judgment of acquittal are reviewed de novo to determine the sufficiency of the evidence. Drawing all inferences and credibility determinations in light most favorable to the prosecution and in support of the verdict, the Court must consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Lee*, 991 F.2d 343, 347 (6th Cir.1993); *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir.1990). The Court reviews decisions denying motions for a new trial and motions to recuse under the abuse of discretion standard. *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir.1996); *Barclays/American Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 396 (6th Cir.1994), *cert. denied*, 513 U.S. 1111, 115 S.Ct. 903, 130 L.Ed.2d 786(1995).

### Discussion

I. *Mail Fraud*

■■■ The Federal Mail Fraud Statute, 18 U.S.C. § 1341, makes it a criminal offense to use the mails for the "purpose of executing" any scheme to defraud or other fraudulent activity.[2] To prove a claim un-

---

1. In addition to practicing law, Hartsel operated a real estate partnership with his wife known as TB3 Properties (TB3). TB3 primarily operated a self-storage business. Additionally, TB3 owned other real estate properties, some of which included office space.

2. At the time of Hartsel's actions, 18 U.S.C. § 1341 read:

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purpose of executing such scheme or artifice or attempting so to do, places in any

der this statute, the government must show proof of the following three elements: (1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so. *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997), *cert. denied*, —— U.S. ——, ——, 119 S.Ct. 40, 41, 142 L.Ed.2d 32 (1998). In *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Court explained that the mail fraud statute was not designed "to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Id.* at 710, 109 S.Ct. 1443 (quoting *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944)). "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Id.* at 715, 109 S.Ct. 1443. The mailing need not be an essential element of the scheme to defraud; it is sufficient if the use of the mail is "incident to an essential part of the scheme, or a step in the plot." *Id.* at 711, 109 S.Ct. 1443 (internal quotations and citations omitted); *United States v. Montgomery*, 980 F.2d 388, 393 (6th Cir.1992). However, the use of the mail must be in furtherance of the scheme to defraud. *United States v. Brown*, 147 F.3d 477, 483 (6th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 270, 142 L.Ed.2d 223 (1998). This Court has explained that "the mailings need not be essential to the scheme, but must be sufficiently closely related to [the] scheme. In other words, for a mailing to be in furtherance of a scheme, the scheme's completion or the prevention of its detection must have de-

pended in some way on the charged mailing." *United States v. Henson*, 848 F.2d 1374, 1378 (6th Cir.1988), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989) (internal quotations and citations omitted); *accord Frost*, 125 F.3d at 358.

■ The District Court found SOH's bank account was an essential part of the scheme to defraud, and that the mailing of the bank statements was incident to maintaining that account, and thus, in furtherance of the Defendant's scheme. Additionally, the District Court held the statements permitted the Defendant to monitor the account and to withdraw the balance. Hartsel contends that the bank statements were not used in furtherance of the scheme to defraud.[3] He maintains that the evidence shows only that the bank statements were received, opened, and filed. Hartsel argues in this appeal that the government must actually prove that he used the statements, and not simply leave it for speculation that the statements could have been used in some way to further the scheme.

Several circuits have faced similar issues related to the mailing requirement of the mail fraud statute and the receipt of bank statements incident to a bank account used to further the scheme. *United States v. Lack*, 129 F.3d 403 (7th Cir.1997); *United States v. Reed*, 47 F.3d 288 (8th Cir.1995); *United States v. Walker*, 915 F.2d 1463 (10th Cir.1990); *United States v. Knight*, 607 F.2d 1172 (5th Cir.1979). In each of these cases, the courts required more than mere receipt of mailed bank statements incident to an essential bank account to establish the mailing requirement under the mail fraud statute. In each case, there was sufficient evidence to show that the bank statements were necessary to the

post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is direct-

ed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1000 or imprisoned not more than five years, or both.

**3.** The Defendant apparently does not dispute that a scheme to defraud existed.

success of the scheme or that they were used in some fashion to aid or further the scheme.

In *Lack*, the defendant engaged in a scheme to defraud his employer, Dairyland Power Cooperative. The defendant's job was to sell the company's used equipment. He would obtain checks from purchasers and deliver these to Dairyland. As a part of his scheme, he established a bank account in his own name doing business as Dairyland Power Conversion, a division of Midwest Computer. As a result of opening this account, the bank mailed regular monthly statements to him. When he sold an item of equipment, he would deposit the purchaser's check into his account, rather than sending it on to his employer. The defendant would then transfer the funds from this account to another account. Occasionally, the defendant would issue a bank check from this second account to his employer with the name of the original purchaser of the equipment as the remitter.

The Seventh Circuit affirmed the district court's finding of a violation of the mail fraud statute. After finding the defendant engaged in a scheme to defraud, the court analyzed whether the government established the mailing requirement. The court held that the bank account was an essential part of the fraudulent scheme because the defendant needed it to launder money and "cloak Mr. Lack's fraudulent venture with an aura of legitimacy." *Lack*, 129 F.3d at 408. The court found that the bank account caused customers to believe they were dealing with Dairyland, and that the mailing of the account statements assured the bank that the account owner was a legitimate business. "[B]ecause the mailing of the bank statements was incident to the opening of that account, those mailings were 'in furtherance' of Mr. Lack's scheme." *Id.* at 409 (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)). Additionally, the court ruled that the bank statements directly aided the de-

fendant in concealing his scheme by allowing him to carefully monitor the scheme's progress. *Id.* The court found that "[t]he bank statements aided Mr. Lack in this effort by serving as the accounting books of his operation; they allowed him to manage the flow between the two accounts and avoid overdrafting the first account." *Id.*

The Eighth Circuit similarly held that bank statements mailed to an accountant satisfied § 1341's mailing requirement. *United States v. Reed*, 47 F.3d 288, 291 (8th Cir.1995). Here, an accountant and an attorney were indicted for mail fraud based on their scheme to steal money held in the attorney's client trust account. A jury found the accountant guilty of mail fraud. On appeal, the accountant argued that the government failed to establish the mailing requirement. The evidence showed that the accountant and attorney deposited large sums of client money, sometimes without authorization, into the trust account. They both would then write checks on the account, frequently depleting the account to a nominal balance. Additionally, the accountant often carried loose checks. He would use these checks without contemporaneously recording the transaction in the register. However, during the course of this scheme, the trust account was overdrawn only once.

In summarizing the district court's finding, the court stated "the district court reasoned that the jury could have found that [the attorney and accountant] were able to maintain their fraudulent scheme without detection by relying in part on the bank statements to coordinate and fine-tune their withdrawals." *Id.* at 290. The court held the district court's finding that the bank statements were essential to the ongoing success of the scheme was supported by the evidence. *Id.* at 290–91. Analyzing *Schmuck*, the court ruled that a rational jury could have found the monthly mailing of the trust account bank statements was an essential part of the scheme. *Id.* at 291. While the bank statements played no direct role in duping the clients,

the defendants needed them to ensure the account maintained a positive balance, which was essential to the continuation of the scheme. *Id.*; *see also United States v. Freitag*, 768 F.2d 240, 243–44 (8th Cir. 1985) (holding mailing requirement satisfied where bank statements allowed defendants to know and keep track of balances in accounts used for check kiting scheme).

 We agree with the District Court's determination that the bank account was an essential part of the defendant's scheme and that the mailing of the bank statements was incident to the maintenance of that account. However, such a determination does not necessarily mandate the ultimate conclusion that the bank statements were used to aid or further the scheme. We agree with those circuits which have addressed this issue that there must be sufficient evidence to show that the bank statements were used in some way to aid or further the scheme before the mailing requirement is satisfied. As we have held in other circumstances "[t]he mailings ... must serve the purpose of executing or furthering the accomplishment of the scheme." *United States v. Frost*, 125 F.3d 346, 358 (6th Cir.1997), *cert. denied*, —— U.S. ——, ——, 119 S.Ct. 40, 41, 142 L.Ed.2d 32 (1998) (holding mailing of vouchers had no relationship to the fraudulent scheme).

To the extent that the Seventh Circuit decision in *Lack* suggests that the mailing requirement is satisfied simply by the mailing of bank statements incident to a bank account which is an essential part of a scheme, we respectfully disagree. However, we believe that a full reading of that opinion clearly shows that the court considered the defendant's use of the bank statements and how that use aided and furthered the scheme. The District Court's opinion in this case is similar. At one point, it states that "[t]he Mid–American account was an essential part of the scheme, and the mailing of the bank statements was incident to that account and were thus in furtherance of the defen-

dant's scheme." Again, to the extent that it is argued that this is sufficient to satisfy the mailing requirement, we disagree. However, a full reading of the District Court's order denying the motion for· acquittal reflects a finding that the Defendant used the statements "to monitor the account and to withdraw the balances." Thus, we must review the evidence to determine if it is sufficient to show that the Defendant used the bank statements "to monitor the account and to withdraw the balances."

That review, however, fails to establish that the bank statements themselves served any useful step, purpose, or role in furthering the scheme. Unlike *Lack* and *Reed*, the record here fails to reveal how the statements served as a bookkeeping or accounting function. Hartsel did not carry and utilize loose checks, waiting until a later time to record the transactions. The evidence does not suggest Hartsel needed the bank statements to reconcile the account and ensure it maintained a positive balance during the period of the scheme. Most of the withdrawals occurred contemporaneously with the deposit of a check from the Jeep Charity Fund.

The government contends the evidence shows that at least on one occasion Hartsel "withdrew money from SOH [sic] account without a deposit, ... lead[ing] to the reasonable inference found by Judge Potter that defendant monitored the bank statements to determine if it contained additional funds to embezzle." However, it is just as likely that Hartsel knew he could withdraw this amount based on the balance maintained in the checking account ledger. Because the evidence could not persuade any rational fact-finder beyond a reasonable doubt that Hartsel actually used the bank statements in furtherance of or as a step in his scheme to defraud the Jeep Charity Fund, the District Court's denial of the Motion for Judgment of Acquittal on the mail fraud count must be reversed.

## II. *Embezzlement of Funds of a Labor Organization*

■ 29 U.S.C. § 501(c) criminalizes any embezzlement, theft, or conversion of money, funds, securities, property or other assets from a labor organization.[4] The District Court found that the Jeep Charity Fund was a fund of Local 12, and accordingly found Hartsel guilty of aiding and abetting the embezzlement of funds of a labor organization. On appeal, Hartsel maintains that the District Court erred in concluding that the Jeep Charity Fund was the fund of a labor organization. He argues that the government's characterization of the Jeep Charity Fund as a tax-exempt organization under 26 U.S.C. § 501(c)(3) renders it a separate entity, and that, as a separate entity, the Jeep Charity Fund fails to satisfy the definition of a labor organization. Additionally, he asserts that the government's belated attempt to characterize the fund as an associate fund of the local union still fails to satisfy the requirement of 29 U.S.C. § 501(c).

■ We agree with the District Court that the Jeep Charity Fund is the fund of a labor organization. Courts should interpret Section 501 broadly "to ensure that elected union officials fulfill their responsibilities as fiduciaries to their members, guard union funds from predators, and keep intact all such funds except those expended in the legitimate operation of the union's business. The funds should be treated as trust funds belonging to the union's members." *United States v. Goad*, 490 F.2d 1158, 1162 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974); *see also United States v. Ellis*, 493 F.Supp. 1092, 1097 (M.D.Tenn.1979), *aff'd*, 617 F.2d 604 (6th Cir.1980)(unpublished opinion).

The Second Circuit has held that assets of a not-for-profit building corporation controlled by a union comprise the assets of a labor organization under § 501(c). *United States v. LaBarbara*, 129 F.3d 81 (2nd Cir.1997). In *LaBarbara*, the defendant served as the principal officer of the local union. The union owned a corporation whose principal asset was the union headquarters. Without the approval of the union's trustees or the corporation, the defendant pledged the union's headquarters as collateral to obtain a loan for the construction of a training facility. The defendant then awarded many of the contracts for the construction project to friends and relatives at higher than normal prices. The defendant was charged and convicted of embezzling union property under 29 U.S.C. § 501(c). On appeal, the defendant argued that the building was not property of a labor organization because the corporation owned it, not the union. *LaBarbara*, 129 F.3d at 85. The court found this argument frivolous, stating the defendant "clearly diverted assets—the value of the building and therefore the value of the Building Corporation—to himself in violation of Section 501(c)." *Id.* Thus, the union's ownership of the corporation stretches its interest to all the assets of that corporation and a theft or improper use of any asset constitutes a violation of 29 U.S.C. § 501(c). *See also United States v. Briscoe*, 65 F.3d 576, 586 (7th Cir.1995) (holding union official's retention of loan application fees from non-members for personal use was sufficient to sustain a conviction under 29 U.S.C. § 501(c)).

In the present case, the money in the misappropriated fund was derived from the paychecks of all the union employees. They intended this fund to be a trust fund managed by the union and used for charitable purposes. Union officials exclusively controlled the selection of charities and

---

**4.** 29 U.S.C. 501(c) states:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

distribution of money from this account. The evidence revealed that union officials authorized and signed all checks from this account. The union maintained the records of the account's activity at its headquarters.

■ The fact the charity fund enjoys tax-exempt status under 26 U.S.C. § 501(c)(3) does not render it a separate entity as Hartsel alleges. Corporations, as well as a community chest, fund, or foundation, can obtain tax-exempt status under this code provision if they engage in charitable or other specified activity. Therefore, we find the assets of the Jeep Charity Fund were the funds of a labor organization, and affirm the decision of the District Court on this Count.

III. *Recusal*

■ On appeal, Hartsel alleges that the District Court judge erred by not recusing himself and ordering a new trial. As a basis for recusal, Hartsel argues that the judge was improperly influenced and compromised by the fact that he was exposed to ex parte information as the presiding judge in Conrad's criminal case. Judge Potter presided over Conrad's plea and sentencing prior to Hartsel's bench trial. Thus, under 28 U.S.C. § 455,[5] Hartsel argues Judge Potter should have recused himself because his impartiality might reasonably be questioned and because he obtained personal knowledge of the disputed evidentiary facts of the case. Hartsel insists that recusal was warranted because the trial judge was not merely presiding over a subsequent jury trial of a co-defendant, but instead, served as the trier of fact.

■ We are of the opinion that Judge Potter did not err by not recusing

himself under the facts of the present case. "[A] judge must recuse [himself] if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality." *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir.), *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 520 (1990). In *United States v. Sammons*, 918 F.2d 592 (6th Cir.1990), we held that a judge who previously presided over a criminal trial and sentencing of the defendant was not required to recuse himself from a subsequent bench trial involving the same defendant. We stated that to justify recusal under 28 U.S.C. § 455, the prejudice or bias must be personal or extrajudicial.

> "Personal" bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases. Personal bias arises out of the judge's background and associations. The critical test is whether the alleged bias "stem[s] from an extrajudicial source and result[s] in an opinion on the merits on some basis other than what the judge learned from his participation in the case."

*Id.* at 599 (quoting *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251–52 (6th Cir. 1989)).

Hartsel fails to point to any specific facts Judge Potter obtained from presiding over Conrad's case which would raise a question about his impartiality. There is no evidence to show that the judge expressed a bias or prejudice against the Defendant or maintained some preconceived notion about his guilt prior to Hartsel's trial. Any information the judge learned about Hartsel or the events surrounding his criminal activities came from his judicial activities and not from extraju-

---

**5.** 28 U.S.C. § 455 reads:
 (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 (b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

dicial sources. Therefore, Judge Potter was not required to recuse himself simply because he presided over a co-defendant's plea and sentencing.

## CONCLUSION

For the foregoing reasons, the decision of the District Court is REVERSED in part, and AFFIRMED in part. This case shall be remanded for further proceedings consistent with this opinion.