UNITED STATES of America, Plaintiff–Appellee,

v.

Aleksandr LEVIT, Defendant–Appellant.

No. 00–4414.

United States Court of Appeals, Sixth Circuit.

April 17, 2002.

Before SILER and GILMAN, Circuit Judges; HEYBURN, District Judge *.

* The Honorable John G. Heyburn II, Chief United States District Judge for the Western

HEYBURN, District Judge.

Following an eventful three days of jury deliberations—featuring two purported deadlocks, a quasi-*Allen* instruction to an individual juror, a standard *Allen* charge to the collective jury, and a near mistrial—a jury convicted Aleksandr Levit on three counts of importing Methylenedioxymethamphetamine ("MDMA," or ecstasy) to the United States with the intent to distribute. Levit appeals the district court's denial of his motions for acquittal and for mistrial. For the reasons stated below, we AFFIRM.

## I.

A reasonably complete review of the evidence will be helpful as a foundation for our decision. On September 26, 1999, Levit wire transferred $8,350.00 from Reynoldsburg, Ohio, to his half-brother, Marat Goldenshtern, in Europe. Goldenshtern claimed the money two days later, and converted it to Dutch guilders. Goldenshtern subsequently arranged for a 1992 BMW 750i to arrive in Bremerhaven, Germany, for shipment to the United States. Goldenshtern then reentered the United States.

On October 25, 1999, a U.S. Customs Inspector in Newark, New Jersey, performed a contraband inspection of the BMW. In the empty gas tank, he found nine bottles of white pills, which field tested positive as MDMA. The pills were later confirmed by chemical identification to be MDMA, and weighed 6.74 kilograms.[1]

The Customs Service and Drug Enforcement Agency decided to attempt a controlled delivery of the car (without the MDMA in the gas tank) to the intended recipients in Columbus, Ohio. A customs

agent sprayed the access panel to the fuel tank—located in the trunk, underneath the interior surface carpeting—with a powder that would coat the hands of anyone attempting to enter the fuel tank via the trunk. The powder was visible only when viewed under an ultraviolet light. Customs agents also installed in the BMW a global positioning system (GPS) device and a trip wire that would trigger a tracking beacon if the fuel tank access panel was removed. The agents also put barely more than one gallon of gas in the car.

During this time, Goldenshtern was contacting customs officials in Newark and inquiring about the status of the BMW's arrival in Columbus. The importation documents listed Dmitri Belialov as the car's importer and owner. Goldenshtern clarified to customs agents that he (Goldenshtern) was the owner, and was importing the BMW for resale to Belialov. An agent recommended to Goldenshtern that he meet with the customs office in Columbus to discuss any discrepancies preventing the vehicle's final shipment. On an unspecified date prior to the controlled delivery, Goldenshtern and Levit did meet with customs officials in Columbus.

On November 29, 1999, a customs official at Rickenbacker Airport in Columbus released the BMW to two men who had come to her office to claim the vehicle. At trial, the agent was unable to identify either of the men. The two men next retrieved the BMW and drove away under surveillance by approximately six state and federal law enforcement officers. For about ninety minutes, the two men drove the BMW around Columbus in a circuitous fashion. They made three stops, two at gas stations, but never refueled the nearly empty gas tank. At least one officer testi-

District of Kentucky, sitting by designation.

1. According to the government, this amounts to approximately 25,000 pills with a retail value of at least $25 a pill, or $625,000.

fied that Levit was driving with Goldenshtern as a passenger.

The BMW eventually arrived at a residence at 129 North Gould Street. The driver backed the BMW into the driveway, so that the trunk of the car was partially inside the garage. A blue Oldsmobile then pulled into the driveway headfirst, between the BMW and the street. This second car was driven by Igor Yanovksy or Dmitri Belialov. Within five to ten minutes after the BMW had pulled into the driveway, the beacon went into "alarm mode," indicating the trip wire had been broken.

The officers immediately descended on the location. A juvenile, later identified as Yevgeniy Spivakov, was apprehended as he walked from the Oldsmobile towards the house. The officers announced their presence and instructed everyone to lie down. One suspect, later identified as Yanovsky, fled from the driveway into the residence. The officers found three other men behind the BMW: Goldenshtern at the rear of the car, Levit around the passenger corner of the vehicle, and Belialov in front of Levit near the rear passenger door.

Officers retrieved Yanovsky from inside the house, and he and the other three adult suspects were "flex-cuffed" and patted down near the BMW. None of the suspects had any hand to hand contact from the time law enforcement arrived on the scene. A black light was shown on each of the suspects' hands, and all had some degree of powder residue on one or both hands. One officer described Levit as having "noticeable residue" on one hand, but "not near" as much as Goldenshtern. Inside the trunk, officers found the fuel pump access plate, which had been removed, a screwdriver, and a pair of pliers.

On December 16, 1999, a grand jury in the Southern District of Ohio indicted Levit, Goldenshtern, Belialov, and Yanovsky on three counts of importing MDMA. Count I charged Levit, Goldenshtern, and Belialov with conspiracy to import MDMA, in violation of 21 U.S.C. § 963. Count II charged Levit, Goldenshtern, and Belialov with attempting to import MDMA, in violation of 21 U.S.C. § 963. Count III charged all four defendants with attempting to possess with intent to distribute MDMA, in violation of 21 U.S.C. §§ 846(A)(1), 841(a)(1) and 841(b)(1)(C). Each of the defendants, with the exception of Levit, entered into plea agreements with the government.[2]

At Levit's trial the government called fifteen witnesses: fourteen state or local law enforcement officials, and one civilian witness, Spivakov. The government did not call Goldenshtern, Belialov, or Yanovsky to testify. At the close of the government's case-in-chief, Levit unsuccessfully moved for judgment of acquittal. Thereafter, Levit's case-in-chief consisted of calling one character witness, a former co-worker. Levit did not himself testify. At the close of all proof, he again unsuccessfully moved for judgment of acquittal.

The case was submitted to the jury around noon on Wednesday, May 24, 2000. Over the course of that afternoon, the jury sent two notes to the court. The first inquired about the differences between inferences and assumptions, the second about an evidentiary matter. The jury retired for the evening at 4:45 PM.

---

2. Goldenshtern and Belialov pleaded guilty to Count I, Yanovsky pleaded guilty to Count III, and all remaining charges were dismissed.

Deliberations resumed at 9:00 AM on Thursday, May 25, 2000. In the early afternoon, the jury sent out a third note, signed by the foreperson, asking: "Once the verdict form has been signed, but *not* submitted, can votes be changed?" The court, after consulting with counsel for both sides, responded: "Yes. Each juror must agree with the final verdict. The verdict is not final until received in open court." The court also suggested that counsel review a potential *Allen* charge.

The jury then sent out a fourth note, written and signed by an individual juror (not the foreperson), which asked: "If I have come to the realization that I cannot in all good conscience pass judgement [sic] on the defendant, can I be replaced by an alternate?" Both the court and counsel agreed to bring the juror into the courtroom individually, inform her that there were no alternates remaining and that she could not be discharged, and inquire if she could continue her jury service. The juror was brought into the courtroom, and the court explained to her the difference between having difficulty voting for a verdict, and simply being unable to function as a juror; e.g., for religious reasons. The court asked if she could continue, and the juror stated: "Yes, I am able to function and take a vote." The court then stated:

> All right, and I don't want to inquire, because what you are doing right now is in absolute confidence, but with that in mind and knowing that there can be no replacement, number one, and that there is at least a possibility if you can't function as a juror, this case will end and have to be retried at considerable expense and grief to everybody in the case, I should emphasize, are you willing to go back and function as a juror?

The juror responded affirmatively. Before the juror returned to the jury room, defense counsel at sidebar objected to the

*Allen*-like language of informing her the case would have to be retried, and expressed concern the court may have placed pressure upon her. The court declined a suggestion to give the entire jury an *Allen* instruction at that time, as the full jury had not yet indicated that it was deadlocked. Instead, the court reminded the juror to review the jury instructions as to her obligations as a juror, and sent her back to deliberate.

That evening, the jury foreperson sent out a fifth note, stating: "This jury cannot reach a unanimous verdict, and we do not anticipate we will be able to given additional time. The signed verdicts, counts 1 & 2 must be considered null & void. Should I tear them up? We already wrote *VOID* across them." The court brought the entire jury back into the courtroom, and first asked if they had been unable to reach a unanimous verdict with respect to all three counts, to which the foreperson answered affirmatively. The court then gave the jury an *Allen* charge, and returned them to the jury room to deliberate further.

Later that same evening, the jury sent the court a sixth note, stating: "We have been deadlocked for the last 7½ hours, we have re-thought and discussed, and we absolutely cannot reach a unanimous decision." The court then told counsel, outside of the presence of the jury:

> I am inclined at this point to declare a mistrial. I have reviewed—The case law is that I can rely on the statement of the foreperson. It appears under the standard of manifest necessity that that has been met, and the jury cannot reach a verdict. Does any counsel disagree?

Both sides agreed, and the court said: "With that we will bring the jury back in, and I intend to discharge them. I intend to discharge them on the assumption that the case can be retried." However, before the jury returned to the courtroom, it sent

out a seventh note, stating: "We would like to re-convene tomorrow morning." Neither side objected, and the court excused the jury for the night.

The following morning the jury resumed deliberating at 9:00 AM. It promptly sent out an eighth note, asking: "Is a juror allowed to make an inference based on a lack of evidence?" In response, the court, without objection from either party, directed the jury to consult the jury instructions. After approximately one hour of deliberation, the jury informed the court that it had reached a verdict. Prior to the jury's entrance into the courtroom, defense counsel again moved for a mistrial, arguing that the instruction to the individual juror, the deadlock, and the speedy verdict that morning together indicated that at least the one holdout juror had been coerced. The court overruled the motion.

The jury returned to the courtroom and the verdict was delivered, finding Levit guilty on all three counts. The jurors were polled individually, and all twelve stated that the verdict read into the record was their verdict. Levit subsequently was sentenced to fifty-eight months imprisonment on each count, to be served concurrently.

## II.

Levit argues that the district court erred in denying his Rule 29 motions for acquittal because the government presented insufficient evidence to support a conviction on any one of the three counts. "Decisions denying a motion for judgment of acquittal are reviewed de novo to determine the sufficiency of the evidence." *United States v. Hartsel,* 199 F.3d 812, 815 (6th Cir.1999). "Drawing all inferences and credibility determinations in [the] light most favorable to the prosecution and in support of the verdict, the Court must consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

Levit argues that, as to each of his three convictions, the evidence was insufficient in the following general respects: it was entirely circumstantial, established solely by the testimony of law enforcement witnesses, and did not demonstrate any criminal acts by Levit. Accordingly, we will examine the evidence supporting each count in turn.

## A.

"To establish conspiracy the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy." *United States v. Puig–Infante,* 19 F.3d 929, 936 (5th Cir.1994). "Only 'slight' evidence is needed to connect a defendant to a conspiracy," but "mere association with conspirators is not enough to establish participation in a conspiracy." *United States v. Gibbs,* 182 F.3d 408, 422 (6th Cir.1999) (quoting *United States v. Pearce,* 912 F.2d 159, 162 (6th Cir.1990)). Finally, "mere presence" at the scene of criminal drug activity "does not by itself demonstrate any tacit or mutual understanding between" the alleged conspirators. *United States v. Peters,* 15 F.3d 540, 544 (6th Cir.1994).

We conclude that the following evidence was more than sufficient to establish that Levit conspired to import MDMA. First, Levit wire transferred $8,350 to Goldenshtern in Europe only days before Goldenshtern arranged for a BMW with a substantial quantity of drugs hidden in the

fuel tank to be shipped to America. Second, Levit accompanied Goldenshtern to the customs office in Columbus to discuss any final hurdles to the delivery of the vehicle. Third, Levit again accompanied Goldenshtern to the customs office and cargo facility in Columbus to retrieve the vehicle. Fourth, Levit and Goldenshtern drove the BMW for more than an hour, with almost no gas, in a circuitous route which could have been designed to evade surveillance. Levit then backed the car partially into a residential garage so that its trunk was shielded from view. Fifth, Levit was standing with the other defendants at the rear of the car, looking into the BMW's open trunk, when arresting officers arrived on the scene. Finally, Levit had ultraviolet powder residue on his hands, indicating that he handled the fuel pump access cover beneath which the MDMA had been hidden.

Levit argues that these facts, even when construed in the light most favorable to the government, establish a criminal conspiracy only if one believes that each of these ostensibly legal actions had an illegal purpose. In fact, argues Levit, the government failed to introduce any direct evidence of criminal activity, such as inculpatory testimony by any of his alleged co-conspirators, proof that the money Levit wired to Goldenshtern was intended for or actually used in an unlawful scheme, or any indication that Levit had knowledge that drugs had been hidden in the BMW.

Granted, the government's case against Levit was entirely circumstantial. But, "[t]he existence of a criminal conspiracy need not be proven by direct evidence, a common plan may be inferred from circumstantial evidence." *United States v. Meyers*, 646 F.2d 1142, 1144 (6th Cir.1981) (quoting *United States v. Luxenberg*, 374 F.2d 241, 250 (6th Cir.1967)). *See also Peters*, 15 F.3d at 544 ("[w]e are also

mindful that circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.") (internal quotation marks, citation omitted). Levit was present at the scene of an operation to enter the BMW's gas tank via the trunk and remove the fuel pump. This is highly suspicious behavior that cannot be easily explained. A jury may reasonably infer that Levit and his cohorts were attempting to withdraw the drugs they believed to be concealed within. Moreover, this was not the only evidence from which the jury could determine Levit's role in the conspiracy. The jury could reasonably infer from the other evidence that Levit took substantial steps to aid the criminal conspiracy. All this is sufficient to find Levit guilty on count one.

### B.

■ In the second and third counts, Levit was convicted of attempting to import MDMA and attempting to possess with intent to distribute MDMA. The elements of an offense involving the importation of narcotics are: "(1) the defendant played a role in bringing a quantity of a controlled substance into the United States from outside of the country; (2) the defendant knew the substance was controlled; and (3) the defendant knew the substance would enter the United States." *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir.1999). "To sustain the possession with intent to distribute charge, it must be proven that [Levit] (1) knowingly; (2) possessed a controlled substance; (3) with intent to distribute." *Peters*, 15 F.3d at 544. Finally, "[t]o convict a person of an 'attempt' to commit a drug offense, the government must establish two essential elements: (1) the intent to engage in the proscribed criminal activity, and (2) the commission of an overt act which consti-

tutes a substantial step towards commission of the proscribed criminal activity." *United States v. Pennyman,* 889 F.2d 104, 106 (6th Cir.1989).

Levit's challenge on these counts is similar to his challenge of the first. He essentially argues that the government has asserted only legal acts to demonstrate both intent and a substantial step. However, a jury may draw reasonable inferences whether conduct is intended for a criminal purpose. Because attempt crimes are inchoate offenses, both the mens rea and actus reus requirements may be satisfied by looking to the entire range of a defendant's conduct, legal and otherwise. "Because of problems of proving intent in attempt cases and the danger of convicting for mere 'thoughts, desires, or motives,'" the Sixth Circuit "requires that the 'substantial step' consist of 'objective acts [which] ... mark defendant's conduct as criminal in nature.'" *Id.* (quoting *United States v. Reeves,* 794 F.2d 1101, 1104 (6th Cir.1986)). Furthermore, "the defendant's objective conduct, taken as a whole, must unequivocally corroborate the required subjective intent to purchase or sell actual narcotics." *Id.* (quoting *United States v. Pennell,* 737 F.2d 521, 525 (6th Cir.1984)).

We conclude that for the same reasons that a jury rationally could have found that Levit had the requisite intent to conspire to import MDMA, it likewise could have found from his objective conduct that he had the requisite intent to attempt to import MDMA, as well as attempt to possess with intent to distribute MDMA. In addition, the jury might have justifiably interpreted Levit's actions of wiring money to Goldenshtern or driving the BMW in Columbus to have been a substantial step towards committing the underlying substantive offense.

### III.

This court reviews for an abuse of discretion the following actions of a district court: 1) a decision to give an *Allen* charge, *United States v. Tines,* 70 F.3d 891, 896 (6th Cir.1995); 2) a response to questions from the jury, and a supplemental instruction to the jury, *United States v. Mitchell,* 67 F.3d 1248, 1252 (6th Cir.1995); and 3) a denial of a motion for a mistrial, *United States v. Talley,* 164 F.3d 989, 1002 (6th Cir.1999).

Levit contends that the district court abused its discretion when instructing the individual juror because, first, the judge highlighted the potential expense and grief of a new trial, and second, when viewed in conjunction with the *Allen* charge to the full jury, the juror was coerced to abandon her holdout position and vote for conviction. Levit further argues that the totality of the circumstances—especially the near-mistrial, followed by the jury's sudden decision to continue deliberating, followed by its speedy verdict to convict—required that the district court grant a mistrial.

### A.

■ When a jury informs the court that it has deadlocked, the judge may deliver a so-called *Allen* charge, modeled after a jury instruction approved by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The charge "exhort[s] the jurors to continue their deliberations in an open-minded fashion." *United States v. Reed,* 167 F.3d 984, 989 (6th Cir.1999). To guard against the possibility that holdout jurors were improperly compelled to abandon their predisposition to vote to acquit a defendant, "[t]he totality of the circumstances in which the *Allen* charge was given must be examined to determine whether the charge was coercive." *Id.* at 990.

Levit does not argue that the *Allen* charge itself was inappropriate, but rather that the *Allen* charge in addition to the earlier instruction given to the individual juror improperly pressured that juror. "[T]he propriety of a supplemental instruction must be measured 'by whether it fairly responds to the jury's inquiry without creating . . . prejudice.'" *United States v. Combs*, 33 F.3d 667, 670 (6th Cir.1994) (quoting *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir.1989)). Furthermore, "[a]lthough circumstances alone can render an *Allen* charge coercive, we traditionally have found an *Allen* charge coercive when the instructions themselves contained errors or omissions, not when a defendant alleges that the circumstances surrounding an otherwise correct charge created coercion." *United States v. Frost*, 125 F.3d 346, 375 (6th Cir.1997). We must therefore determine whether the supplemental instruction to the individual juror itself coerced that juror, thereby prejudicing the defendant and requiring a mistrial.

Levit points specifically to the district court's statement to the individual juror that if she could not continue to function as a juror, "this case will end and have to be retried at considerable expense and grief to everybody in this case . . . ." The Sixth Circuit has criticized delivering an *Allen* charge to a jury that includes reference to the cost and burden of a jury deadlock, but also held that such reference does not constitute per se reversible error. *See United States v. Giacalone*, 588 F.2d 1158, 1167 (6th Cir.1978); *United States v. Harris*, 391 F.2d 348, 354 (6th Cir.1968). Although we disfavor any mention of the burden and expense of a retrial as a "questionable extension" of an *Allen* charge, we also will look to the circumstances of each case to determine whether the district court "unduly emphasized" these factors so as to have a coercive effect upon the ju-

rors. *See Giacalone*, 588 F.2d at 1167; *Harris*, 391 F.2d at 354.

The district court took care to consult counsel and properly inquired whether the juror could "in good conscience pass judgment on the defendant." A close reading of the transcript reveals that Levit's counsel objected not to the instruction itself, but rather to the fact that the quasi-*Allen* charge had been delivered to a single juror and not the entire jury. First, as to the propriety of instructing the juror individually, we have made clear that "[t]he timing of an *Allen* charge is left to the trial judge's sound discretion." *Tines*, 70 F.3d at 896. An *Allen* charge to the full jury typically is made only once the entire jury has indicated that it is deadlocked. *Id.* At this point in time, only one juror had expressed her inability to arrive at a verdict, and it was therefore appropriate for the district court to address her separately. Second, as to the substance of the instruction, after Levit's attorney raised his concerns about the separate *Allen* charge, the court explicitly noted that "I'm looking for any possible prejudice to anybody here. I want to make sure that I haven't done that." Defendant's counsel emphasized that "I would just like the Court to make sure that she is absolutely certain that she doesn't need to change her vote." The court replied: "I could tell her to go back and look at the instructions on her role as a juror. How would that be?" Counsel's response, "That will be fine, Your Honor," indicates that Levit's attorney was satisfied that the court's brief reference to the possible expense and grief of a retrial did not amount to undue emphasis or coercion, and that the district court had not abused its discretion.

### B.

Nevertheless, Levit argues that the chain of circumstances indicates prejudi-

cial unfairness. Levit argues that the totality of the circumstances—especially the sudden request to resume a third day of deliberations following an expression of hopeless deadlock, the fact that jury deliberations lasted longer than the trial itself, and the speed with which the jury reached a verdict upon reconvening on Friday morning—indicate coercion of an exhausted holdout juror. Levit therefore concludes that the proceedings were unfairly prejudicial, and the district court ought to have declared a mistrial.

The Sixth Circuit, "in considering whether a mistrial is appropriate, is primarily concerned with fairness to the accused." *Talley*, 164 F.3d at 1002 (citing *United States v. Chambers*, 944 F.2d 1253, 1263 (6th Cir.1991)). For the following reasons we conclude that the chain of events was neither coercive to the juror nor prejudicial to Levit. Levit's theory is entirely speculative, and does not support a conclusion that the district court abused its discretion in denying a mistrial. The relative speed with which the jury reached a verdict following the *Allen* charge is irrelevant. "This court has explicitly rejected the notion that an '*Allen* charge may or may not be considered coercive depending upon the speed with which a verdict is reached.'" *Tines*, 70 F.3d at 896 (quoting *Giacalone*, 588 F.2d at 1167). Moreover, the individual juror was not compelled to an immediate verdict. The jury retired for the evening and reconvened the following morning for another hour. Clearly, one juror reevaluated her position, but the timeline does not suggest that coercion was probable. Even though the court declared its intention to grant a mistrial following the second statement by the jury that it was deadlocked, the jury voluntarily requested that it be permitted to continue deliberations the next day. While this was a fairly sudden about-face by the jury, it resulted from no prodding by the court. The jury decided, of its own volition, that the deadlock could be resolved with further discussion. Finally, the court polled the jurors individually, allowing each the opportunity to recant their verdict if in fact they had been improperly coerced into casting a vote contrary to their true belief as to Levit's guilt. In sum, it appears that the jury opted to continue deliberating in an effort to fulfill their roles as jurors, and it was not an abuse of discretion for the judge to allow them to do so.

## IV.

For the reasons stated above, we AFFIRM the judgment of the district court.